CRABB v. WELDEN BROS. et al.

DEDRICK v. SAME.

PETERSON et al. v. C. F. LYTLE CO. et al.

Nos. 374, 479, 503.

District Court, S. D. Iowa, C. D.

March 12, 1946.

H. L. Bump, of Des Moines, Iowa, for plaintiffs Crabb and Dedrick.

Alfred T. Vollum, of Albert Lea, Minn. (of Vollum & Nichols, of Albert Lea, Minn.), for plaintiffs Peterson and Vollum.

Peter W. Janss (of Brunk & Janss), of Des Moines, Iowa, and Bert E. Church, of Wellington, Kan., for defendants.

DEWEY, District Judge.

Suits were instituted in this court by four salaried employees to recover overtime compensation under the provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., against certain independent contractors who had engaged in the construction of the Alcan Highway.

The cases were consolidated for trial to the court.

In the spring of 1942 the United States of America was contemplating the con-

struction of an international vehicular highway from Ft. St. John in Canada to a point in Alaska subsequently determined to be at Big Delta to join with an existing highway that continued to Fairbanks.

The highway was to follow a line of airports then existing in Canada and Alaska: Ft. St. John, Ft. Nelson, Watson Lake, Whitehorse, Boundary, Big Delta, and the respective termini of the existing roads in Canada and Alaska. It was to be called the Alcan Highway and was about 1,400 to 1,500 miles in length, about 300 miles of it in Alaska. (Distances are given for descriptive purposes and not intended to be accurate).

The project was delegated to the Public Roads Administration and that agency in turn employed the C. F. Lytle Company and the Green Construction Company as "project managers" for that part of the construction work in Alaska. And in 1942 there was procured and employed in such construction fourteen contractors who are designated as "affiliated contractors." These affiliated contractors and the project managers were authorized to and did enter into written contracts with individuals of different classifications to do the work.

The Army was working upon a supply road along the proposed route, and the project managers with the affiliated contractors took charge as soon as they could get their organization and the Government could transport those organizations and equipment to Alaska.

The only work that could be accomplished during the year 1942 was to build a supply trail or road. They did in that year with the use of heavy equipment knock down and push to one side of the trail or road the trees encountered. The roots did not extend very far into the ground because it did not thaw more than two or three feet below the surface. One reason the ground did not thaw any more in the short summer season was a deposit which covered the surface of the ground known as tundra or muskeg, some two or three feet in depth which served as an insulation.

The several project managers and the Public Roads Administration were able to and did finish a temporary road or trail in 1942 along the general route indicated. Besides removing the trees they removed the tundra and ditched the sides of the road to some extent, but it was not a finished road and, in fact, in the year 1943 they found it more difficult to use in some places than if the tundra had not been removed, as the summer thaw without the tundra soon made a morass of mud and mire that in many places prevented the use of trucks and equipment. Especially was this true in Canada from Whitehorse to the boundary line of Alaska, a distance of at least 50 miles.

Temporary bridges were constructed which washed out during the winter and spring of 1942–1943.

The Public Roads Administration in the spring of 1943 completed and published its surveys, location and plans and specifications for the permanent road and bridges. While the location of the permanent road was not influenced by the location of the supply trail or road, they were both built or to be built along the same proposed route which brought them more or less together or adjacent to each other.

In the year 1943 the project managers allocated the different portions of the work in Alaska to seventeen associated contractors, and the work was diligently prosecuted and completed, with the possible exception of a permanent bridge or two, by the middle of October in 1943. It was on this work in 1943 that these plaintiffs were employed.

The Public Roads Administration paid all the expenses of the project. It maintained offices in Seattle and perhaps at other points in the United States; bought and shipped the goods necessary for the feeding, housing and comfort of the men and for doing the work. These goods were sent to Alaska in convoyed ships and were unloaded on docks at the port of Valdez in southern Alaska. The goods were unloaded by Army personnel and first assembled at Valdez and later taken to warehouses and distributing points at different locations, by employees of contractors working under the direction of the project managers and the Public Roads Administration. Some of it was stored during the preceding winter in Fairbanks, Alaska. Later in the summer other storehouses were prepared and used on the highway and especially at a point known as Tok where a managerial headquarters had been constructed on the Alcan Highway.

The above method of procuring and delivering the goods did not include the gas and oil requirements. The Standard Oil Company of California maintained a gasoline storage plant at Valdez and sold and

delivered in Alaska the gasoline and oil products, directly to the Public Roads Administration. Gasoline and oil products constituted more than half of all the supplies that were used by the contractors in building the road in Alaska. However, this does not mean that large quantities of goods were not brought in and distributed to the affiliated contractors, as it took a tremendous amount of goods to furnish the men with food, housing facilities and supplies, and the contractors with construction materials and equipment. One of the associated contractors was the Hoak Transportation Company which undertook to and did transport the goods, first, to the distributing points and later from those points to the contractors, although the associated contractors often hauled a part of their own supplies. One witness gave as a rough estimate the number of men employed on the project during the summer of 1943 at 5,000 and some 500 trucks being used in the transportation of supplies.

The general direction of the Alcan Highway from Ft. St. John in Canada to Big Delta and ultimately to Fairbanks, Alaska, ran in a northwesterly direction, but for our purposes we will consider it as running east and west.

When the project was started in 1942 there was a vehicular road known as the Richardson Highway from the port of Valdez extending in a northerly direction to Fairbanks. While this road was not an A-1 highway it was good enough for scheduled bus service. At a point about 75 miles north of Valdez on this road was a place called Gulkana, which was a managerial headquarters in 1942 and in the early part of 1943.

In order to facilitate the movement of the supplies to the main highway—as it was a roundabout route to go through Fairbanks —there was a cut-off extended in 1942 on what was known as the Slana Road or trail from Gulkana to a point on the Alcan Highway about midway between Big Delta and the Alaskan border. This point or place was first known as TanaCross, and was used as a storage depot and headquarters for some time but later they were moved a short distance east to Tok. The distance from Valdez to Tok by this supply route was about 150 miles. And Gulkana was about half way between Valdez and Tok.

In the year 1943, then, substantially all the supplies for the project in Alaska were moved from Valdez over the Richardson Highway and the Slana Road to Tok; and were distributed east and west on, or along, the Alcan Highway to the headquarters of the several affiliated contractors, located on that part of the Alcan Highway which they had been assigned to complete.

Under this general statement of the existing conditions in the year 1942 and 1943 we turn to the claims of the individual plaintiffs.

Plaintiff S. F. Crabb was employed by the defendant Welden Brothers, one of the associated contractors, by written agreement dated the 20th day of March, 1943, as a "Timber Foreman" at a basic wage of $525 per month. Mr. Crabb went to Alaska by plane, arriving at TanaCross on April 28, 1943. The headquarters of Welden Brothers at that time was at Clearwater, about 12 miles south of TanaCross on the Slana supply road, and he proceeded to construct, repair and put in operation three sawmills located at various places near Clearwater. He had four or five men at each of the mills, besides men in the timber, cutting and hauling logs for lumber. When trouble would appear at the sawmills he did the actual physical work in their repairs and to keep them in operation. The smaller of the mills was known as No. 3 mill and he testifies that when not otherwise occupied he ran this mill himself and also was often called upon to cruise the timber, help fell logs and provide the means and assist in bringing the logs from the timber to the sawmills.

After hearing his testimony I have no doubt of his doing more than 20 per cent. of work of the same nature as that performed by nonexempt employees under him. He is a man of considerable executive experience and ability and I also have no doubt that he had the authority to and did exercise that authority in firing men, and that his recommendations in the change of employee's classifications were given particular weight.

The plaintiff Frank B. Dedrick also signed a contract of employment with Welden Brothers, whereby he was engaged as a "Bridge Foreman" at a basic wage of $575 per month. He arrived in Alaska March 29, 1943. His general occupation was foreman in the building of the permanent bridges on the highway in Alaska.

The evidence establishes that more than 20 per cent. of his work was of the same nature as that performed by the nonexempt

employees under him. He had the authority to fire the workmen and his recommendations in the change of employee's classifications were given particular weight by his employer, Welden Brothers.

Gustaf E. Peterson signed a contract of employment with C. F. Lytle Company and Green Construction Company on the 21st day of April, 1943, as a "warehouse clerk" at $250 per month. He arrived in Alaska on April 29th and was at first clerk in the warehouse at Gulkana and later was at TanaCross and at Tok. His general duties were practically the same at these places, although on August 16th his salary was raised to $300 per month with the same classification as a "warehouse clerk." As such clerk he had the general duties of checking in all of the material that came to the warehouse where he worked, and seeing that none of it went out without a proper receipt. This receipt was known as "Form No. C—14" and was designated as "Combined Requisition and Warehouse Invoice." He was the custodian of these receipts. Mr. Peterson's work therefore during all the time that he was on the job was looking after the warehouses and the property in transit in his warehouse and seeing that it was properly invoiced, both incoming and outgoing. He also assisted in loading some of the goods into the transportation trucks.

The plaintiff Gilbert E. Vollum entered into a written contract of employment with said project managers on the 21st day of April, 1943, as a "warehouse foreman" at a basic wage of $350 per month. He arrived in Alaska sometime in April and at Gulkana on April 25th. His work was practically the same as that performed by Mr. Peterson. He did not stay until the work was completed but left the employment of the defendants on August 17, 1943.

The defendants do not claim that either Mr. Vollum or Mr. Peterson were executives within the definition of that term as promulgated by the Administrator and the only question as to their right to recover is whether they were engaged in interstate commerce.

Some general findings may be helpful to limit the discussion of the claims of the individual plaintiffs.

First. The plaintiffs here can recover only if they themselves were engaged in interstate commerce.

The actions are brought to recover under the provisions of Section 207 of the Fair Labor Standards Act. That section limits the provisions of the Act to employees "engaged in commerce or in the production of goods for commerce." Before therefore an employee can recover under the provisions of the Act he must establish by a preponderance of the evidence either that he was engaged in commerce or that he was engaged in the production of goods for commerce.

While the definition of the word "produced" in the Act broadens its meaning from that of general use, in order to come within the provisions of the Act the employee must still be associated in some manner with the production of goods. Western Union Telegraph Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335.

The highway was constructed over a route that was a comparative wilderness and had no manufacturing plants and there were no goods produced in its neighborhood or any indication that there would be any produced in the future. The construction of the highway was not the producing of goods. Nieves v. Standard Dredging Corp., 1 Cir., 152 F.2d 719, 720.

I find therefore that none of the employees was engaged in the production of goods for interstate commerce during their employment in Alaska.

With this limitation then to entitle an employee to recover he must prove that he was "engaged in commerce."

"Commerce" as defined by the Act itself means—"Trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." Sec. 203(b), Title 29, U.S.C.A.

The Act also defines "State" as meaning "any State of the United States or the District of Columbia or any Territory or possession of the United States." Sec. 203(c), Title 29, U.S.C.A.

It might be said at this point that the definition of "commerce" given above is much broader than the old definition of commerce, which meant trade between the States. The definition does not require the transportation to be in the pursuit of trade and it makes no difference whether the goods handled were the personally owned goods of the employer, or goods moving interstate for the convenience of the Government. Clyde v. Broderick, 10 Cir., 144 F.2d 348, 351; Umthun v. Day & Zimmermann, Inc., Iowa, 16 N.W.2d 258, 261.

373

■ Under the provisions of the Fair Labor Standards Act it is the work of the employee which is decisive and the test to be applied to such work is not whether the employee's activities affect or indirectly relate to interstate commerce, but whether they are actually in or so closely related to the movement of commerce as to be a part of it.

"Such 'commerce' extends 'throughout the farthest reaches of the channels of interstate commerce' * * * and its presence or absence is determined 'by practical considerations.'" Walling v. Mutual Wholesale Food & Supply Co., 8 Cir., 141 F.2d 331, 335.

Second. I find that when the goods from the United States arrived at Valdez and were delivered to the Public Roads Administration or the project managers the interstate character of the shipment did not cease nor did it end until delivered to the several associate contractors.

The goods were purchased in the United States by the Public Roads Administration and were shipped from Seattle, Washington, by sea partly in the name of the Public Roads Administration in Alaska and partly in the name of the Lytle and Green Companies.

However, it was all one project. All of the goods in Alaska used on the project were owned by the United States of America. It was a joint adventure between the Public Roads Administration and the Lytle and Green Companies and they exercised joint control over all of the goods until they were expended. Machinery that was brought to Alaska by the contractors was rented to the Public Roads Administration and came under the control of the project managers and such machinery as well as the men could be and were shifted among the contractors as was determined to be necessary by the project managers.

In the fall of 1942 each of the contractors was asked to requisition such repair parts for their machinery as they thought they would need for the 1943 season. Many of these goods came to Alaska in the name of the contractor who had made the requisition, but immediately upon their arrival they were taken in charge by the Public Roads Administration or the project managers and were parceled out and distributed as those managers saw fit. The only purpose in having the goods in the warehouses was for inventory and distribution. The

ownership of the goods was not changed. It was a temporary halting of the transportation from the United States to the associated contractors.

It seems to me that there can be no doubt about this question from the decisions of the Supreme Court and the Circuit Courts of Appeal in the cases of Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Walling v. Mutual Wholesale Food & Supply Co., 8 Cir., 141 F.2d 331; Walling v. American Stores Co., 3 Cir., 133 F.2d 840; Clyde v. Broderick, 10 Cir., 144 F.2d 348, 350.

In the case of Walling v. Jacksonville Paper Co., 317 U.S. 564, 568, 63 S.Ct. 332, 335, 87 L.Ed. 460, the court, among other things, said: "There is no indication * * * that, once the goods entered the channels of interstate commerce, Congress stopped short of control over the entire movement of them until their interstate journey was ended. No ritual of placing goods in a warehouse can be allowed to defeat that purpose. The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer 'in commerce' within the meaning of the Act. As in the case of an agency * * * if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce." 317 U.S. at page 568, 63 S.Ct. at page 335, 87 L.Ed. 460.

The fact that all of the goods handled by the project managers did not have an interstate character such as the gasoline and oil products is not important.

■ Where a part of the activities of an employer relates to goods moving in interstate commerce and a part of such activities relate to goods moving in intrastate commerce, if a substantial part of the employee's activities relate to those goods which are moving in interstate commerce, he is covered by the Fair Labor Standards Act. Walling v. Jacksonville Paper Co.,

317 U.S. 564, 572, 63 S.Ct. 332, 87 L.Ed. 460.

Under this situation and law there can be no doubt that Mr. Peterson and Mr. Vollum during their employment in 1943 were engaged in interstate commerce, as their activities were so closely related to the movement of these goods from Valdez to the associated contractors as to be a part thereof. Republic Pictures Corporation v. Kappler, 8 Cir., 151 F.2d 543.

Mr. Crabb, however, has not established that he was so engaged in interstate commerce. He was not working on the highway or directly carrying supplies to and for it. He was what is known in the authorities as an "off the road employee" and was not so closely connected with the commerce or transportation as to be a part of it. McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538; Industrial Accident Commission v. Davis, 259 U.S. 182, 42 S.Ct. 489, 66 L.Ed. 838; E. C. Schroeder Co. v. Clifton, 10 Cir., 153 F.2d 385; Hallstein v. Pennsylvania R. Co., 6 Cir., 30 F.2d 594; Walling v. Craig, D.C., 53 F.Supp. 479, 482; Oliphant v. Kaser Construction Co., decision by Judge Hays in the District Court of Iowa in and for Dallas County.

Mr. Dedrick's work, as pointed out, was the building of new and permanent bridges on the permanent Alcan Road in Alaska. He did not personally move or have any contact with the movement of goods, but his work can be considered as being so closely related to the movement of goods in interstate commerce as to be a part thereof, if these bridges were instrumentalities of interstate commerce; otherwise not.

One working upon, repairing, improving, or even personally delivering materials required for such work, improvement or repair on such an instrumentality, is considered a participant in the movement of goods thereon. Pedersen v. Delaware, L. & W. R. Co., 229 U.S. 146; Walling v. Patton-Tulley Transp. Co., 6 Cir., 134 F.2d 945; Overstreet v. North Shore Corp., 318 U.S. 125, 130, 63 S.Ct. 494, 87 L.Ed. 656.

Upon this question of whether the road being constructed was an instrumentality of interstate commerce, the authorities are collected in the case of Hallstein v. Pennsylvania R. Co., 6 Cir., 30 F.2d 594, 595, with the following conclusion:

"Where work is being done by an employee upon or directly in connection with an instrumentality which itself is being used in interstate commerce * * * such as * * * bridges * * * the employee has been held to have been engaged in interstate commerce. * * *

"On the other hand, where the instrumentality upon which the employee is at work or in connection with which he is engaged is not directly connected with interstate transportation, or where such instrumentality has been withdrawn from or not yet dedicated to use in such commerce, although it may last have been so used or be intended ultimately for such use, it has repeatedly been held that the work was not so closely related to interstate commerce as to be practically a part of it."

It is a close question whether these new bridges at the time of construction were instrumentalities of interstate commerce.

One working on the original construction of a new road is generally not engaged in interstate commerce, although the road when finished is intended for use in such commerce. Pedersen v. Delaware L. & W. R., 229 U.S. 146, 151, 33 S.Ct. 648, 57 L.Ed. 1125, Ann.Cas.1914C, 153; New York Cent. R. Co. v. White, 243 U.S. 188, 191, 37 S.Ct. 247, 61 L.Ed. 667, L.R.A.1917D, 1, Ann.Cas.1917D, 629; General Ry. Signal Co. v. Virginia, 246 U.S. 500, 38 S.Ct. 360, 62 L.Ed. 854; Bamberger Electric Co. v. Winslow, 10 Cir., 45 F.2d 499; Hallstein v. Pennsylvania R. Co., 6 Cir., 30 F.2d 594; Nieves v. Standard Dredging Co., 1 Cir., 152 F.2d 719; E. C. Schroeder Co. v. Clifton, 10 Cir., 153 F.2d 385; Noonan v. Fruco Const. Co., 8 Cir., 140 F.2d 633; Dollar v. Caddo River Lbr. Co., D.C., 43 F.Supp. 822; Brue v. J. Rich Steers, Inc., D.C., 60 F.Supp. 668, 670; Ritch v. Puget Sound Bridge & Dredg. Co., D.C., 60 F.Supp. 670, 671.

The Alcan Road did not become an international road until its completion in October, 1943, nor could the road or trail built in 1942 be used as an international road as that part of it east of the Alaska boundary in 1943 was impassable for traffic and was not used for commerce.

It is true that in the fall of 1943 three associate contractors or their crews did some work east of the boundary. Supplies were delivered to them there in some manner but the evidence discloses that it could not have been on the 1942 road.

Were it not for the commerce flowing from the port of Valdez to the associated contractors these roads could not be considered instruments of commerce and building bridges thereon would have to be considered as intrastate employment.

It is not necessary that the road itself extend from one State or province to another. It is the use of the road and not the road itself that determines its commercial character. "The building and operation of a bridge or a road or a canal is not commerce in the substantive sense, but is the creation and use of a physical thing as a medium by and through which commerce is regulated, since such creation and use condition and facilitate transportation." People of State of New York ex rel. Rogers v. Graves, 299 U.S. 401, 406, 57 S.Ct. 269, 271, 81 L.Ed. 306; 15 C.J.S. Commerce, § 34, p. 324.

We have determined that the transportation of the goods, supplies and material from Valdez on the supply route to Tana-Cross or Tok and then east and west along or upon the Alcan Road or trail in Alaska to the associated contractors was interstate transportation or commerce. Insofar then as this transportation was upon such roads they were instruments of commerce and any work or repair thereon that facilitated the movement of these interstate goods would be so closely related to the movement as to be a part thereof.

The evidence does not directly show that these permanent bridges were used for the transportation of these goods. The permanent road was constructed by bringing it to grade and placing thereon a hard surface of sand and crushed rock. It is natural to infer that as soon as a part of this permanent road was constructed it was used in the transportation of these goods, supplies and materials. And as the old bridges built in 1942 were temporary and more or less destroyed during the winter of 1942–1943, it is also natural to infer that these permanent bridges were used in the conveying of these supplies as soon as they were completed.

 The building of these two roads, one each year, was part of the same project. This is shown by the managerial and employment contracts with the Public Roads Administration. The 1942 road or trail was built for two purposes: first, as a supply road for the building of the permanent road, and, second, for propaganda purposes. The work in 1943 was a continuation and completion of the 1942 work and under the rule that control of the statute extends to the furthest reaches of interstate commerce, I think it can fairly be said that the new road and bridges were an improvement and rebuilding of a road used for interstate commerce and that Mr. Dedrick in building the bridges was engaged in repairing and improving an instrumentality of interstate commerce. Walling v. Patton-Tulley Transportation Co., 6 Cir., 134 F.2d 945, 949.

The two plaintiffs in Action No. 503, Mr. Peterson and Mr. Vollum, claim that in addition to the wages due them under the Fair Labor Standards Act they are entitled to recover double time for their work on the 7th day. The evidence establishes that the workweek started on Monday and ended at Sunday noon. Sunday was therefore the 7th day of the week.

The claimed right to recover the double time for the work performed on Sunday morning is based upon Executive Order No. 9240, 40 U.S.C.A. § 326 note issued under the authority of the Stabilization Act of 1942, 50 U.S.C.A.Appendix § 961 et seq.

The defendants claim that neither of these plaintiffs is entitled to recover under the provisions of this Executive Order in that, 1st, the claim presents no litigable right and, 2nd, that this court does not have original jurisdiction of plaintiffs' claims under this order.

The contract between the Government, acting through the Public Roads Administration agency and the C. F. Lytle Company and the Green Construction Company, being a contract for engineering management services in the construction of the Alaska-Canada Highway project, No. 3, provides by Article 9, as modified by the amendment of date, Dec. 31, 1942, that— "The hours of employment and wage rates shall also be subject to the provisions of Executive Order No. 9240, promulgated Sept. 9, 1942."

Here, then, is a contract between the Government and the defendants in this action that the latter in the construction of the project would pay its employees in accordance with that portion of Executive Order No. 9240 providing that—"where because of emergency conditions an employee is required to work for seven consecutive

days in any regularly scheduled workweek a premium wage of double time compensation shall be paid for work on the seventh day."

The prevailing doctrine in the United States is generally that a third person may sue to enforce a binding contract or promise made for his benefit, although he is a stranger to both the contract and the consideration therefor. 17 C.J.S., Contracts, § 519 subsec. c, p. 1121. The claim of plaintiffs therefore presents a litigable right.

On the question of federal jurisdiction, the rule is well settled that when jurisdiction has attached because of the federal question involved, the court will proceed to a complete adjudication of all the questions involved in a particular controversy, not merely the one which supports its jurisdiction. This court has jurisdiction of proceedings brought under the Fair Labor Standards Act, both because it is an action to regulate commerce; Robertson v. Argus Hosiery Mills, 6 Cir., 121 F.2d 285, 286; and because express authority is given by the provisions of the Act itself. However, jurisdiction of a separate and distinct cause of action cannot be conferred by uniting it with a cause of action on which there is federal jurisdiction. Cyclopedia of Federal Procedure, 2d Ed., Vol. 1, Sec. 63. The action here is to recover for overtime wages and not separate and distinct causes of action.

The evidence establishes that each of the plaintiffs worked the number of hours each week as shown by the record kept by them on the employee's daily time slips. Plaintiffs in Action No. 503 and plaintiff in Action No. 479 are entitled to recover their overtime pay.

Mr. Dedrick, I think, has fairly established that he was not an executive within the definition as delimited by the Administrator of the Fair Labor Standards Act.

I have carefully considered the arguments of counsel that Mr. Dedrick was the head of an establishment, but in neither his case nor that of Mr. Crabb do I find any merit in their contention.

Mr. Dedrick has failed to show by a preponderance of the evidence that any work he did prior to April 12th, 1943, was in commerce.

Findings of fact and conclusions of law as to each claimant are filed herewith.