## HARRINGTON v. EMPIRE CONST. CO.
### Civil Action No. 2413.

District Court, D. Maryland.
March 3, 1947.

Jacob Blum, of Baltimore, Md., for plaintiff.

Harry J. Dingle, of Baltimore, Md., for defendant.

WILLIAM C. COLEMAN, District Judge.

This is a case arising under the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219.

As a result of the original hearing the plaintiff was found to be entitled, under the Act, to recover from the defendant additional compensation on account of wages, and, since the parties were unable to agree on the sum due, the case was referred to a Special Master for the purpose of taking testimony and determining the correct amount. He has reported his findings to the Court, to which both parties have filed certain exceptions. The matter is now before the Court on these exceptions.

Summarizing the Special Master's conclusions, they are as follows: (1) That the regular work-week of the plaintiff in the field was 48 hours; (2) that his regular office work-week prior to May, 1943, was 42 hours, and subsequent thereto, 40 hours; (3) that he was entitled to certain additional sums for Sunday work. As a result, the Special Master reported that he found the total sum of $2,228.95 to be due the plaintiff by the defendant.

The plaintiff excepted to the Special Master's findings on the ground (1) that he was employed on a 40-hour work-week instead of a 48-hour work-week, and (2) that the Special Master has failed, as directed by the Court, to recommend what counsel fee should be allowed the plaintiff.

The defendant has excepted to the Special Master's report on the ground (1) that the plaintiff, instead of being employed on a 48-hour work-week, was employed on a six-day work-week basis on a fixed salary, regardless of the number of hours worked during any week, and (2) that the plaintiff was not entitled, as the Special Master found, to payment for double time on account of work performed on Sunday or the seventh consecutive work-day.

It will thus be seen that the Special Master, the plaintiff, and the defendant are all three in disagreement as to the basis on which the plaintiff was employed. So we shall proceed first to a consideration of the Special Master's findings on this question.

The formula for determining an employee's regular hourly rate of pay has been definitely fixed by the Supreme Court. In Overnight Motor Company v. Missel, 316 U.S. 572, at page 580, 62 S.Ct. 1216,

1221, 86 L.Ed. 1682, the Court said: "No problem is presented in assimilating the computation of overtime for employees under contract for a fixed weekly wage for regular contract hours which are the actual hours worked, to similar computations for employees on hourly rates. Where the employment contract is for a weekly wage with variable or fluctuating hours the same method of computation produces the regular rate for each week. As that rate is on an hourly basis, it is regular in the statutory sense inasmuch as the rate per hour does not vary for the entire week, though week by week the regular rate varies with the number of hours worked. It is true that the longer the hours the less the rate and the pay per hour. This is not an argument, however, against this method of determining the regular rate of employment for the week in question. Apart from the Act if there is a fixed weekly wage regardless of the length of the work-week, the longer the hours the less are the earnings per hour." See also Walling v. Youngerman-Reynolds Hardwood Company, 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705.

 The rule thus announced is correctly embodied as follows, in an Interpretative Bulletin of the Wage and Hour Administration (Bulletin No. 4, paragraph 10): "If the employee is on a weekly salary basis, his regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the regular number of hours worked or if no regular number of hours is worked, by the total number of hours worked each week. If the employee works a *regular number of hours,* the regular hourly rate of pay will be a fixed rate, remaining unchanged from week to week. But if the employee works a *fluctuating and not a regular number of hours,* his regular hourly rate of pay will be the average hourly rate for the week and will vary from week to week." (Emphasis supplied.)

The defendant company was engaged in the construction business. The plaintiff was employed as one of its field clerks from March 26, 1941, to January 17, 1944. He had previously worked for the defendant in the same capacity. His duties included responsibility for buying material, making out invoices, etc., and also supervising the making of certain payrolls. During the time here in question the defendant was engaged in construction work at various places near Baltimore, and, in the course of his employment, the plaintiff worked on eleven of these projects as well as in the defendant's local office. There appears to have been no definite understanding between plaintiff and any representative of the company at the time plaintiff commenced his employment as to what would be the unit of time for computing the amounts due him, other than that he was employed on a weekly salary which varied during the period of employment from $40 to $60 a week. Plaintiff insists he was employed for a 40-hour week; in other words, that if he were paid $50 a week his regular hourly rate of pay would be $50 divided by 40, or $1.25 per hour. The defendant, however, maintains that plaintiff was employed for a variable number of hours per week; in other words, that in weeks when he may have worked 70 hours his regular hourly rate of pay would be $50 divided by 70, or only 71 cents per hour, and in weeks when he may have worked 54 hours, it would be $50 divided by 54, or 93 cents per hour. Disagreeing with both of these contentions, the Special Master found that plaintiff was employed on basis of a 48-hour week for field work; in other words, that his regular hourly rate of pay would be $50 divided by 48, or $1.04 per hour; and that for office work he was employed part of the time on a 42-hour basis, and for the rest on a 40-hour basis.

The Special Master heard a large amount of testimony on the question. He summarized his conclusions as follows: "(1) The payrolls do not show the actual or any (hours) time worked by the plaintiff; (2) that the regular work-week of the plaintiff in the field was 48 hours; (3) that the regular work-week of the plaintiff in the Baltimore office prior to May, 1943, was 42 hours; after that the work-week was 40; (4) that the plaintiff was employed at a weekly salary. This was at different times

$40, $45, $50 and $60 per week. If he worked on Sunday, he received one-sixth of his weekly salary in addition to the above. Under the circumstances of the case, these payments for Sunday work are credits to be allowed against his unpaid compensation for overtime work."

The testimony is, in many instances, not only conflicting but ambiguous. We shall not attempt to set forth here our detailed analysis of it, but, as a result of this analysis, we reach the conclusion that with respect to plaintiff's employment until May, 1943, neither the conclusion of the Special Master nor the contention of the plaintiff is correct, but that the position of the defendant is the one that more accurately represents the true situation, namely, that plaintiff was employed for a variable number of hours per week. That is to say, plaintiff's hourly wage must be computed separately for each week worked until May, 1943, including such periods of time as were worked in the Baltimore office, by dividing the number of hours he actually worked into the amount of pay he was actually receiving.

We believe that the reasons advanced by the Special Master for his conclusion that the plaintiff was employed prior to, as well as after May, 1943, on a 48-hour week for field work, and on a 42-hour week basis up to that time, but on a 40-hour week basis thereafter for office work, do not, by the weight of the more credible evidence, support that conclusion, but, on the contrary, indicate that the plaintiff was employed prior to May, 1943, at a weekly salary for a six-day week, regardless of the kind of work or the number of hours worked. It is true that the plaintiff and other like employees were instructed to report their hours of work for payroll purposes as eight hours per day, six days per week, or a total of 48 hours. However, there is no indication that the defendant would have been satisfied to employ plaintiff if he had worked merely 48 hours per week, regardless of the exigencies of his job. Also, we believe it is clear from the testimony that plaintiff understood he was employed to do each given job, regardless of how many hours this would require. It

is apparent that the defendant's payrolls were falsified, not, however, for the purpose of indicating that plaintiff was employed for a regular number of hours, but either for the purpose of more simple bookkeeping or in order to deceive the Wage and Hour Division. As was said in the Hardwood Company case, supra, 325 U.S. at pages 424, 425, 65 S.Ct. at page 1245, 89 L.Ed. 1705: "The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments. It is not an arbitrary label chosen by the parties; it is an actual fact. Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the wage contract."

Although, as disclosed by the testimony heard by the Special Master, the Wage and Hour Division was apparently of the opinion that plaintiff was employed on a 48-hour per week basis prior to May, 1943, we believe this view is not to be given much weight, in view of the fact that it was predicated almost entirely upon an examination of incorrect payroll records, and not upon the actual facts as disclosed before the Special Master.

The question whether the basis of plaintiff's salary was changed after the audit of defendant's books by the Wage and Hour Division in May, 1943, is somewhat more difficult to answer from the testimony. However, we conclude, by the weight of the most credible parts of the testimony, that the defendant did, after May, 1943, on the recommendation of the Wage and Hour Division, adopt for all of its field clerks, including the plaintiff, a 48-hour week, rather than one of fluctuating hours. In other words, we believe, as respects the period of plaintiff's employment subsequent to May, 1943, the conclusion of the Special Master was correct as respects plaintiff's field work. Also, we believe that he should have made the same finding as respects plaintiff's office work for the same period.

■ To summarize our conclusions with respect to plaintiff's basis of pay, they are as follows: (1) The payrolls, taken by themselves, do not show the actual number of hours worked by the plaintiff; (2) his regular work-week, whether in the field or in defendant's Baltimore office, was, prior to May, 1943, for a variable number of hours, leaving to his own discretion the amount of time that he might spend upon any given job in order to complete it; and, (3) plaintiff's regular work-week subsequent to May, 1943, was 48 hours, regardless of whether he worked in the field or in the office.

We turn now to the next question to be settled, which is raised by defendant's exceptions, namely, whether the Special Master was correct in finding that plaintiff was entitled to certain extra pay for Sunday or the seventh consecutive work-day. The Special Master's findings on this point are set forth in his report, as follows: "I also find that on the Baltimore & Ohio Fairfield contracts no. 1 and 2, on certain days the plaintiff was entitled to compensation for overtime or premium pay under Executive Order 9240, 40 U.S.C.A. § 326 note, covering work on holidays and the sixth and seventh consecutive days in a scheduled work week. Defendant's attorney earnestly contended that on these contracts the defendant was exempted from the provisions of this Order, by reason of being engaged in transportation work. Although the transportation industry was exempted from the Order, I can not and do not find that the defendant, even when working upon a railroad track, was engaged in transportation.

"Except as to the jobs or contracts mentioned in the preceding paragraph, I find that none of the other work performed for the defendant by the plaintiff was covered by Executive Order 9240, which did not become effective until October 1, 1942."

Executive Order 9240, which the Special Master construed and which, as appears from the above quotation from his report, he found entitled plaintiff to the extra or premium compensation therein provided with respect to work performed by plaintiff in connection with two, but not with respect to any of the other projects, was promulgated September 9, 1942 and amended September 17, 1942, effective October 1, 1942. See 40 U.S.C.A. § 326 Note. It seems unnecessary to quote the Order here. Summarized, it provided, for the duration of the war, for the payment of premium and overtime wage compensation on all work relating to the prosecution of the war, to all those engaged in such work on the sixth and seventh consecutive day of their regular scheduled work-week, and also on certain holidays specified in the Order.

Although the Order provides in its preamble that it is issued by the President by virtue of authority vested in him by the Constitution and statutes, the precise basis for the authority he exercised is not stated. Apparently, the Order was issued pursuant to authority believed to flow from the Hours of Labor on Public Works Act, 40 U.S.C.A. §§ 321–326, and from the Stabilization Act of 1942, 50 U.S.C.A.Appendix, §§ 961–971.

By the express terms of the Order (section 5) the Secretary of Labor was directed to interpret its provisions. Accordingly, on February 17, 1943, he issued Interpretative Bulletin No. 1 relating thereto. By this bulletin the Order was declared to apply to all work performed by prime contractors on government war contracts, by their subcontractors and those who make the materials and supplies necessary for the performance of such contracts and subcontracts, and it extended to enterprises engaged in producing, processing, mining, or manufacturing products used by government contractors or subcontractors in the manufacture of war products. "Enterprises which provide public transportation of communication facilities, storage, distribution or warehousing facilities" were held not to be covered by the Order. The Interpretative Bulletin further declared that if a particular plant be engaged in war work and within the scope of the Order's coverage, then the entire plant would be subject to the Order, including production, clerical, and maintenance employees.

■ We understand it is defendant's contention that it was exempt from the

provisions of Executive Order 9240 with respect to projects on which plaintiff worked, known as Baltimore & Ohio Railroad Fairfield contracts nos. 1 and 2, because defendant was engaged in transportation work. However, while a contractor may be said to be engaged in transportation in the broad interstate commerce sense when engaged in constructing a railroad track (see J. F. Fitzgerald Const. Company v. Pedersen, 324 U.S. 720, 65 S.Ct. 892, 89 L.Ed. 1316; McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538; Overstreet v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656), nevertheless, we believe it to be too wide a departure from the ordinarily accepted meaning of the words "enterprises which provide public transportation", used in the Interpretative Bulletin, to say that the defendant in the present instance was "providing public transportation" in carrying out the projects referred to. We believe it was the intent of the Secretary of Labor, as expressed in the Interpretative Bulletin, to exclude from the coverage of the Executive Order those enterprises whose efforts, while contributing to the prosecution of the war, even though in a very substantial sense, would, nevertheless, normally be in the same channels if war had not intervened. Accordingly, we agree with the Special Master that the defendant's activities on the two projects referred to were not exempt by the terms of the Executive Order. However, for the reasons we are about to state, we do not find that plaintiff is entitled to invoke the benefits of the Order in relation to any of his work embraced in this proceeding.

This Order has been involved in only a few published court decisions, and, then mostly in a jurisdictional or incidental way, or where the facts were not parallel with those in the present case. See National Labor Relations Board v. Brown-Brockmeyer Co., 6 Cir., 143 F.2d 537; Brockway v. Long, D.C., 55 F.Supp. 79; Adams v. Long, D.C., 65 F.Supp. 310; Crabb v. Welden Bros., D.C., 65 F.Supp. 369; Steiner v. Pleasantville Constructors, Inc., Sup. App., 49 N.Y.S.2d 41; Id., 269 App.Div. 738, 54 N.Y.S.2d 700; Steiner v. Pleasant-ville Constructors, Inc., 182 Misc. 66, 49 N.Y.S.2d 42; Id., 269 App.Div. 738, 54 N.Y.S.2d 700; Chambers v. W. L. Florence Construction Co., 73 Ga.App. 172, 36 S.E.2d 69.

For example, Crabb v. Welden Bros., supra, was also a suit by employees to recover overtime compensation under the Fair Labor Standards Act. There was involved a contract between the Government and an independent contractor for construction of a highway. This contract provided that it was subject to Executive Order No. 9240. The Court held that since jurisdiction existed because the action was brought under the Fair Labor Standards Act, it was appropriate to adjudicate all other questions arising as part of the litigation. Therefore, the Court heard the employees' claim with respect to their rights under Executive Order No. 3940, since, generally speaking, a third person may sue to enforce a binding contract or promise made for his benefit, even though he may be a stranger to both the contract and the consideration for it.

However, in the present case, the contracts for the work in question were not introduced in evidence and plaintiff has failed to prove just what the pertinent provisions in the contracts may have been, and whether, by their terms, they were made subject to this Order. In fact, the testimony on this point is very sketchy and unsatisfactory. The plaintiff testified that the B. & O. R. R. Fairfield contracts nos. 1 and 2 were related to the war effort. On the other hand, Sparks, defendant's office manager, testified that the projects covered by these contracts were not government jobs, although the Bethlehem-Fairfield Track project was a government job. Sparks further testified that he was not prepared to say whether any of the defendant's contracts were covered by the Walsh-Healy Act, 41 U.S.C.A. §§ 35–45), or by Executive Order No. 9240. The plaintiff maintained that the Aberdeen Track project was a government job, falling under the last-mentioned Act. Sparks agreed as to the character of the project, but testified that he did not really know which project came under the Walsh-Healy Act or

Executive Order No. 9240, and which did not.

In view of the character of the aforegoing testimony, we do not think it supports the distinction that the Special Master made between the B. & O. Fairfield contracts nos. 1 and 2 and the Aberdeen Track job in finding that the former were covered by Executive Order No. 9240, but the latter was not. That is to say, since, by the very terms of Executive Order No. 9240 and Interpretative Bulletin relating thereto, no right is given to the employee to litigate his rights thereunder in the absence of a showing of a contract for his benefit, we conclude that the plaintiff here is not entitled to recover under this Order for work done in connection with any of the contracts involved in the present suit.

■ Stated more precisely, we conclude that the Special Master was in error in allowing to the plaintiff time and one-half for the sixth consecutive day of his work week, and double time for the seventh day, while employed on B. & O. R. R. Fairfield contracts nos. 1 and 2, for the reason that, although the defendant, while on these contracts, cannot be said to have been engaged in an "enterprise which provides public transportation" within the exemption of Executive Order No. 3940, plaintiff has, nevertheless, failed both to allege in his Complaint that he is entitled to benefits under Executive Order No. 9240, and to prove by the weight of the credible evidence that these or any other contracts were subject to this Order. Therefore, we do not feel that plaintiff is entitled to the benefits of this Order with respect to work performed in connection with any of the contracts or projects here involved. This being true, it becomes unnecessary to consider the situation in the light of the fact that in any event the Order could not be invoked with respect to work done prior to October 1, 1942 because the Order was not in effect prior to that time.

■ It is next appropriate to consider the manner in which the Special Master treated certain overpayments which the plaintiff made to himself. That is to say, in certain weeks of his employment in 1943 plaintiff made payments to himself without having been authorized to do so by defendant. Plaintiff did this under the belief that certain amounts were due him as overtime compensation under the Fair Labor Standards Act. But, he actually paid himself more than was due him for those weeks during which the sums were taken by him. When apprised of this, defendant objected and demanded that the amounts be refunded. The Special Master treated them as a debt which plaintiff owed the defendant and, after computing the amounts that defendant owed the plaintiff as overtime under the Fair Labor Standards Act, the Special Master deducted these payments from the amount of overtime wages due plaintiff before adding an amount equal to the overtime wages as liquidated damages.

Plaintiff has excepted to this method of computation by the Special Master, claiming it is contrary to this Court's decision in Black v. Roland Electric Co., D.C., 68 F.Supp. 117. In this, we believe plaintiff to be correct. In the Black case, we held that an employer could not apply a payment made in one week to the employee in excess of the requirements of the Fair Labor Standards Act to payments made in other weeks which did not equal the requirements of the Act. In other words, we believe that the Special Master erred in subtracting the amounts as he did from the overtime compensation due plaintiff before liquidated damages were taken into consideration. However, the plaintiff here is apparently seeking to obtain even more than the Fair Labor Standards Act, as we have interpreted it in the Black case, would appear to entitle him to get. In short, his argument seems to go to the extent of saying that *under no circumstances* can the defendant obtain *any credit* for overpayments of the character in question. We believe that this position is not correct. It, in effect, encourages misappropriation.

In order to simplify and more clearly present our reason for so concluding, we will resort to hypothetical figures which substantially parallel those actually involved in the present case, rather than use actual figures adopted by the Special Master, especially since the latter, for the other reasons which we have hereinbefore given, are subject to change.

Let us assume that in each of four successive weeks, designated A, B, C, and D, plaintiff should have received $65 under the Act, but was, in fact, paid only $60 per week. Thus, $20 would still be due to him under the Act for these four weeks. Let us further assume that in the fifth week (E) in which plaintiff should likewise have received $65 under the Act, he was paid only $60. Thus, $5 would be due to him under the Act; but plaintiff pays himself $7 extra for week E, and also $7 extra for each of the two weeks, C and D (a total of $21 extra). Similarly, in the sixth week (F), plaintiff should have received $65 under the Act, but we will assume was paid only $60, so $5 would be due to him under the Act. But again, plaintiff, believing certain amounts were due him under the Act in that week, pays himself an extra $7. Thus, we have the following situation;—

made in a given week as credits against amounts due in the same week under the Fair Labor Standards Act. Since, therefore, in weeks E and F plaintiff overpaid himself to the extent of $21 and $7, respectively, *for overtime,* and *since some overtime payment was due* for those weeks, the defendant should be given a credit in weeks E and F against such amounts for overtime as are found due under the Fair Labor Standards Act. In other words, in week E, instead of merely $5 being paid plaintiff as due under the Fair Labor Standards Act, he received an additional payment of $16. Likewise, in week F, instead of $5 being paid him, which was all that was due him under the Fair Labor Standards Act, he received an additional payment of $2.

Summing up, then, for the entire six weeks (A, B, C, D, E and F), there remains due the plaintiff a sum of $20 under the

| Week | Due under the Act | Payments Authorized | Balance Due | Unauthorized Payments by Plaintiff to Himself |
|------|------|------|------|------|
| A | $65.00 | $60.00 | $5.00 | |
| B | $65.00 | $60.00 | $5.00 | |
| C | $65.00 | $60.00 | $5.00 | |
| D | $65.00 | $60.00 | $5.00 | |
| E | $65.00 | $60.00 | $5.00 | $21.00 |
| F | $65.00 | $60.00 | $5.00 | 7.00 |
| | | | $30.00 | $28.00 |

On the basis of these hypothetical figures, we must assume that the Special Master found that the defendant owed the plaintiff $30, and that the plaintiff owed the defendant $28. So, the Special Master subtracted the $28 from the $30, leaving $2 due the plaintiff from the defendant. Then the Special Master added an equal amount ($2) as liquidated damages due the plaintiff, giving the plaintiff an allowance of $4. This, we believe to be incorrect.

Plaintiff maintains that the $30 should be doubled and plaintiff paid $60, completely forgetting about the $28. He argues that the Black case supports this result. This, we believe to be incorrect.

In the first place, the Black case does not forbid the application of overpayments

Fair Labor Standards Act, and there is a debt owed by the plaintiff to the defendant in the amount of $18.

In the second place, while the Fair Labor Standards Act, as we have interpreted it in the Black case, requires that the plaintiff employee receive not only such amounts as are due him as overtime compensation ($20), but also an equal amount in liquidated damages ($20) (a total of $40), the Act does not deny to the defendant employer, as in an ordinary contract case, a set-off, or credit, for such amounts as the plaintiff may owe him after the liquidated damages have been computed. In this respect, we have a set of facts that are to be distinguished from those in the Black case. There, the credits that the defendant

**332**

claimed for a set-off were not *debts owed* to him by the plaintiffs. They were (1) payments made to employees in accordance with the defendant's regular wage policy (i. e., these amounts were contractually due the employees for the work performed by them); and (2) year-end bonus payments which were considered as either (a) a gift or (b) compensation. At any rate, in the Black case—apart from any consideration of the Fair Labor Standards Act—*it could not be said that the employees owed their employer anything.* But in the case at bar, if we consider what plaintiff did—apart from the Fair Labor Standards Act—this defendant could have brought an action for an accounting against him because of the unauthorized conversion, to his own use, of funds which he had improperly taken. Thus, as distinguished from the Black case, this is an instance where the employee was actually *indebted* to his employer. This money ($18) was not paid to plaintiff according to any general wage policy, wage contract, or union agreement, or as a gift. On the contrary, it was something that plaintiff misappropriated and, therefore, must return.

Therefore, while the plaintiff must receive not only the amounts due for overtime ($20) but also an equal amount ($20) as liquidated damages under the Fair Labor Standards Act, yet the defendant may take credit for such amounts as the plaintiff owes him *after* liquidated damages are taken into consideration. In other words, under the hypothetical figures suggested above, the following calculation must be made:

| | |
|---|---|
| Due plaintiff as overtime under the Act | $20.00 |
| Due plaintiff as liquidated damages under the Act | 20.00 |
| Total due under the Act | $40.00 |
| Owed by plaintiff to defendant | 18.00 |
| Total judgment for plaintiff | $22.00 |

To summarize, applying these conclusions to the findings of the Special Master, we reach the following results:

1. The Master found that $2,228.95 was due the plaintiff as overtime compensation under the Fair Labor Standards Act. Since, as hereinbefore explained, we differ with the Special Master's findings with respect to (1) what was plaintiff's regular hourly rate of pay, and (2) with respect to the applicability of Executive Order No. 9240, this figure of the Special Master must necessarily be re-computed, but we use it for sake of illustration.

2. The Master found $5 overtime due plaintiff under the Act for the week ending August 29, 1943. But plaintiff on that date overpaid himself $270 ($18 for that week, and $252 for 14 previous weeks). Therefore *no* overtime was due for week of August 29, 1943; and plaintiff owed defendant $265.

3. The Master found $5 overtime due plaintiff under the Act for the week ending September 5, 1943. But plaintiff on that date overpaid himself $18 for that week. Therefore, *no* overtime was due for week of September 5, 1943; and plaintiff owed defendant $13.

4. The Master found $5 overtime due plaintiff under the Act for the week ending September 12, 1943. But plaintiff on that date overpaid himself $18 for that week. Therefore, *no* overtime was due for week of September 12, 1943; and plaintiff owed defendant $13.

5. The Master found no overtime due plaintiff under the Act for the week ending November 21, 1943. But plaintiff on that date overpaid himself $14.06 for that week. Therefore, plaintiff owed defendant $14.06.

6. The Master found no overtime due plaintiff under the Act for the week ending November 28, 1943. But plaintiff was only due $65 for that week (not $70 as computed by the Master, because the Master's computation was based on Executive Order No. 9240, which, under heading II, supra, may not be applied here). Therefore, plaintiff was overpaid $5 for that week, in addition to the sum of $3.75, which he, on the above mentioned date, overpaid to himself, or a total of $8.75 for the week of November 28, 1943. Therefore, plaintiff owed defendant $8.75.

7. The Master found that plaintiff was overpaid $10 for the week ending December 26, 1943. Therefore, plaintiff owed defendant $10.

8. The total amount which the Master found due as overtime ($2,228.95—item 1 above) must be reduced by such amounts as were due in those weeks when plaintiff overpaid himself (all such overpayments having been made in the weeks hereinbefore enumerated):

$5.00—item 2 above (Aug. 29th)
$5.00—item 3 above (Sept. 5th)
$5.00—item 4 above (Sept. 12th)

9. Total amount due for overtime compensation under the Act would be:

$2,228.95—item 1 above
15.00—item 8 above

$2,213.95

10. The equal amount due as liquidated damages would be $2,213.95.

11. The amount due to the plaintiff from the defendant under the Fair Labor Standards Act, therefore, would be:

$2,213.95—item 9 above
2,213.95—item 10 above

$4,427.90

12. Before judgment is rendered for the plaintiff, the following amounts which the plaintiff owes the defendant must be considered:

$265.00—item 2 above
13.00—item 3 above
13.00—item 4 above
14.06—item 5 above
8.75—item 6 above
10.00—item 7 above

$323.81

13. To the above amount must be added the difference between the two following sums: (1) $165.59, the sum plaintiff has repaid the defendant, as shown by the Special Master's report and which is not disputed; and (2) $467.39, the sum the defendant has paid plaintiff in part settlement of overtime wages or $301.60. This latter amount, added to $323.81 (item 12 above), gives $625.41 which subtracted from $4,427.90 leaves $3,802.49, which is the net amount we find to be due plaintiff based on the aforegoing figures.

■ There is one other factor that remains to be considered which is involved in the Special Master's computation, namely, travel-time. The special Master found that plaintiff was not entitled to compensation for time which he consumed in traveling to and from any of the jobs upon which he worked. The plaintiff has excepted to this finding, maintaining that inasmuch as he met his Superintendent in Baltimore and was driven to Aberdeen by the Superintendent, he, plaintiff, was entitled to be paid under the Fair Labor Standards Act for the time so consumed in travel.

We cannot agree with this contention. We believe that the Special Master's conclusion is correct and is supported by rulings of the Supreme Court and numerous lower court decisions. Any other conclusion would carry an employer's obligations to an absurdity.

In Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, the Supreme Court specifically differentiated between time spent in traveling from a worker's home to his place of work and so-called walking time spent on the employer's premises at the employer's instance, stating that work of the latter character, but not traveling time, must be included in the statutory work-week and compensated accordingly, regardless of contrary custom or contract. To the same effect is Jewell Ridge Corporation v. Local, 325 U.S. 161, 65 S. Ct. 1063, 89 L.Ed. 1534, and Tennessee Coal, Iron & R. Co. v. Muscoda, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949, 152 A.L.R. 1014. Likewise the Special Master's ruling in the present case is in conformity with Walling v. Mid-Continental Pipe Line Co., 10 Cir., 143 F.2d 308; West v. Texas Co., D.C., 65 F.Supp. 97; Walling v. Peavy-Wilson Lumber Co., D.C., 49 F.Supp. 846; Bulot v. Freeport Sulphur Co., D.C., 45 F.Supp. 380; Sirmon v. Cron & Gracey Drilling Corp., D.C., 44 F.Supp. 29; Dollar v. Caddo River Lumber Co., D.C., 43 F.Supp. 822.

■ Finally, we turn to the matter of attorney's fee. The Special Master failed to make any recommendation in this re-

**334**

spect and plaintiff has taken exception to this failure.

Since, unless the parties are able to enter into an agreement with respect to the amount to which plaintiff is now entitled when the computation is corrected in accordance with this opinion, the case must be again referred to the Special Master for the purpose of having him make the corrected computation, we prefer that he should, also, as originally directed, recommend the attorney's fee that he believes appropriate. This, the Special Master should be able quite readily to do, because the new computation as required by this opinion turns to a large extent upon the number of hours plaintiff worked in each week prior to May, 1943, and the Special Master has determined what these hours amount to, no exception has been taken to his calculation, and, therefore, his figures are not subject to be reopened at this time.