ARCHIBALD C. ADAMS, APPELLANT, v. JOHN C. LONG AND ROBERT W. LONG CO-PARTNERS DOING BUSINESS AS LONG CONSTRUCTION COMPANY, AND TURNER CONSTRUCTION COMPANY, A CORPORATION, JOINT CONTRACTING PARTIES, RESPONDENTS.—202 S. W. (2d) 112

Kansas City Court of Appeals. Opinion delivered March 3, 1947.

1228

*E. Robert Klein, Terrell & Slaughter, Charles W. Hess* and *James W. Taylor* for appellant.

1230

· *H. M. Langworthy, Clyde J. Linde* and *Robert B. Langworthy,* for respondents. *Langworthy, Matz* and *Linde,* of counsel.

DEW, J.—The plaintiff, appellant here, brought suit in two counts, in the first of which he sought to recover unpaid compensation, liquidated damages, and attorney's fee under the Fair Labor Standards Act of 1938, and in the second count to recover double time pay under Executive Order 9240, as amended, issued by the President of the United States, for work performed on the seventh days of his workweeks. Trial by jury was waived. Judgment was rendered for defendant on both counts, from which plaintiff has appealed.

This action grows out of services performed by plaintiff to the defendants, who were engaged in the original construction of a large war plant known as the Pratt & Whitney plant, located on the outskirts of Kansas City. On July 6, 1942, defendants, as joint contractors, had entered into a cost-plus-fee contract for the original construction of this plant with the United Aircraft Corporation of Missouri (whose name was later changed to Pratt & Whitney Aircraft Corporation of Missouri), acting for and on behalf of the Defense Plant Corporation created under the Reconstruction Finance Corporation Act, and all the work performed thereunder related to the prosecution of the war. Wage schedules and classifications were thereupon agreed to and approved. Plaintiff's period of employment by the defendants dated from October 27, 1942 to May 1, 1943. The number of hours worked by the plaintiff and the dates thereof are not controverted.

The theory of plaintiff's Count 1 is that in the performance of his work he was, within the meaning of the Fair Labor Standards Act of 1938, engaged in interstate commerce, or that the same was so related to interstate commerce as to become a part thereof, or that he was engaged in a process or occupation necessary to the production of goods for commerce, or that his services substantially affected the production of goods for commerce.

The substance of Count 2 is that plaintiff is entitled to additional wage allowances in Executive Order 9240, as amended, for services on the seventh days of his workweeks.

The theory of defendants' answer and defense to Count 1 is the negative of all of the contentions therein made, and that the Fair Labor Standards Act does not apply.

As to Count 2, the answer is that plaintiff has no cause of action under such Executive Order.

Plaintiff's evidence tended to show that he was employed by the defendants' superintendent of concrete as a "field clerk"; that his duties consisted of keeping records of rock, sand and cement that came into the concrete plant, received largely from other states, including records of cars spotted at Dodson near the plant, and deliveries by truck; records of the distribution of the materials to the various concrete "batch plants" on the site, and records of materials undelivered or on hand in stock piles. He also kept certain cost records of the finished concrete. This clerical work was done from railroad manifests, and other information furnished him by other employees and from which he posted his entries showing the shippers, car numbers, quantity and application to order numbers, and also the distribution to the various subcontractors in the concrete department on the site. He did not handle the freight bills, bills of lading or invoices. He did not help load or unload any of the materials. His office was located near the center of the plant site. Railroad switches entered the site at guarded entrances, where warehouses and receiving offices were maintained by other departments and where all shipments were checked and received. Truck deliveries were likewise received and checked at site entrances by other departments. Prior to January 13th, the concrete was mixed by a subcontractor and sold to the defendants ready mixed. Cement, sand and gravel therefor were received and checked by such subcontractors, and plaintiff's chief duties then were to audit, classify and file tickets for all loads of such concrete so furnished defendants, and to record the distribution thereof on the site. After January 13th, defendants mixed the concrete used, and plaintiff's duties consisted largely of posting the information stated as to materials received, materials on hand and how distributed on the plant site with cost records, all made from data supplied by others. He also kept a "Hired Dump Truck Record", and an "Inspector's Daily Record" of batch yardages of processed concrete, and an operating cost record of the labor in the concrete department. Prior to January 13th, about one-third of his time was spent in making the material reports and thereafter about three-fourths of his time was so spent. The records kept by plaintiff were furnished to the concrete superintendent and assisted him in regulating the supply of materials needed on the job. Plaintiff claims these records of material helped to keep "an even flow of materials" from other states into the plant when needed.

Plaintiff testified that he was employed at $45 per week for a six eight-hour day week, and was given to understand that a plan was under consideration to pay on an hourly basis and time and a half for all over 48 hours a week, and double time on Sundays. However,

he understood that such plan was not yet in effect when he was employed, and that he would receive $7.50 for Sunday work, the average daily basic rate, which he was, in fact, so paid and which he had accepted and received. He talked several times to his superintendent about the pending plan to pay overtime.

Plaintiff claimed he worked 1104.25 hours regular time of his six-day workweeks for which he had been paid .9375 cents per hour, or a total of $1035.25; that he worked 471.25 hours over 40 per week (including the seventh day work) for which he should have been paid time and a half, or $662.70, a total of $1698.03, under his Count 1, as against the total of $1320, received, leaving $378.03 due him on that count, plus a like amount as liquidated damages, plus attorney's fee estimated at $600. He testified he had worked 143.75 hours on seventh days of his workweeks for which he was paid time and a half and should have been paid double time under Executive Order 9240, sued for in his Count 2, leaving $67.38 yet due him for such days.

On the part of defendants, evidence was produced which tended to show that the warehouse crew actually received, checked and reported all materials entering the plant site, including all sand, rock and cement; and same was by that department classified by cars, car numbers, checked against bills of lading, and shippers noted, and that this information was passed on to other departments for approval for payment and for whatever purposes were required. A similar system was used to check the arrival of all truckloads of material entering the site. All this was done by the warehouse department in which plaintiff was not employed. Such reports and records were shown in defendants' Exhibit 1, which contained defendants' reports of materials, names of the shippers, order numbers, quantity and distribution of the material. It was not necessary to the obtaining of these records of receipt of materials that plaintiff keep the records which he testified he made. When plaintiff quit his employment at the site, the plant was still under original construction, not being completed until January, 1944. No manufacturing was ever done in the plant by defendants and none had been done by Pratt & Whitney before December 19, 1943. Plaintiff's capacity was "field clerk" and as assistant to the concrete superintendent he received daily records of incoming freight and of cars spotted, awaiting distribution, and received the car numbers thereof. He conveyed all this information to the concrete superintendent's office. The concrete department did not order materials, but merely sent requisition forms to the purchasing department. Some of the cement used came from Oklahoma and Kansas.

Defendants' auditor testified that prior to January 13, 1943, concrete was obtained from the subcontractor already mixed; that thereafter witness requisitioned materials therefor, obtained the payment therefor and for transportation charges; that the defendants were

never engaged in any manufacturing at the plant; that all non-manual employees were employed at $45 per six-day week, with one-sixth of that amount for work on the seventh day; that where salaries of $50 or more were paid to such employees the same were inclusive of all hours of the day's work. He said the method of obtaining materials was that the field superintendents would submit requisitions therefor to their department heads; then the purchasing department would call for bids and select the vendor; the shipping department would follow up the order, the traffic department, on delivery, would verify rates and keep demurrage schedules of carload shipments; the expediting department would trace all shipments until arrived, and freight bills were mailed by the railroad to the accounting department for payment. He said records of the shipments were to inform the superintendents of the amount of materials on hand and on order. Executive Order 9240 had come to the attention of the witness, but the Defense Plant Corporation never began any negotiations to change the wage schedules under the contract and he knew of no understanding with the corporation that the wages should be paid in conformity with the Order. (It was agreed that Sundays could be considered as the seventh day of plaintiff's workweek). Witness said that if the Fair Labor Standards Act applied to plaintiff, the overtime for work in excess of 40 hours per week would be one-half of the basic hourly rate arrived at by dividing the total hours worked during the week by the amount paid for the week, multiplying it by the hours over 40. This, he computed, would amount to $196.07 for overtime "premium", not including liquidated damaged. He said that if Executive Order 9240 also applied, the plaintiff would be entitled to $120 additional, arrived at by allowing double time for seventh days, less credit for straight time for all of which he had already been paid. This would amount to a total of $254.84. The witness said that if neither law applied, plaintiff would be entitled to $7.50 for each Sunday worked, for which he was paid in accordance with the terms of his employment. Attorney's fees were not included in these computations.

In rebuttal plaintiff recalled the defendants' representative who employed him, who stated that employees such as the plaintiff, were required to work every day as long as the concrete gang was working, and "until the job for the day was finished". The plaintiff did later discuss with him the matter of overtime.

At the close of all the evidence defendants moved for a directed verdict on practically all of the same grounds as urged here in defense. No action was taken by the court on the motion.

The court, at the request of plaintiff, made a finding of fact that plaintiff was employed by the defendants from October 27, 1942 to May 1, 1943, on the basis of a six day, 48 hour week at $45 per week.

The court refused plaintiff's findings of fact that plaintiff was at all times concerned a field clerk for defendants' superintendent in charge of the concrete batch plant; that his services related to the transportation or movement of goods in interstate commerce, and were essential and indispensable to the actual movement of commerce so as to be a part thereof; that Article XVI, Section 1 of defendants' contract required compliance with all Federal laws, and that Executive Order 9240, as amended, had the force and effect of Federal laws.

At the request of the plaintiff the court gave conclusions of law to the effect that the defendants were not a "service establishment" as contemplated by the Fair Labor Standards Act of 1938, and by reason thereof plaintiff was under said act; that plaintiff's regular rate of pay is determined by dividing the number of hours contracted for per week (48) into the agreed wages ($45), and that ownership of material, even though in the Federal Government, does not bar operation of said Fair Labor Standards Act. The court refused to give Conclusions of Law requested by the plaintiff finding plaintiff to have been engaged in interstate commerce while employed by defendants; that Executive Order 9240 had the force and effect of Federal law, which created a right to premium wages for certain work in the plaintiff and others similarly employed, and where no specific remedy was provided, a common law action to enforce the same could be used; that defendants' contract required compliance with the Federal laws and Executive Order 9240, and that no further steps were necessary to make the same a part of said contract, enforceable by plaintiff as a third party beneficiary; that plaintiff, a field clerk, whose duties were essential and necessary to the even flow of goods moving in interstate commerce, shows such connection with commerce as to be a part of it.

At the request of defendants, the court made findings of fact that at all times mentioned, they were engaged in the original construction of a war plant on a site provided by the Defense Plant Corporation, a corporation created under the Reconstruction Finance Corporation to aid the United States in its national defense program; that said construction work was performed under a contract between the defendants and the United Aircraft Corporation of Missouri, (later changed to Pratt & Whitney Aircraft Corporation of Missouri), acting for and on behalf of the Defense Plant Corporation on a cost-plus-a-fixed-fee-basis; that all materials shipped in and used in the construction of said plant were purchased under written orders issued by or on behalf of the Defense Plant Corporation, and by it paid for; that defendants did not process or produce any goods for commerce; that plaintiff was at all times a field clerk for defendants' superintendent in charge of concrete construction, and that plaintiff did not receive or unload incoming materials nor did his services relate to transportation or the movement of goods in interstate commerce; that in August, 1942, the Defense Plant Corporation approved the wage rate which

was paid to plaintiff by defendants, and the Defense Plant Corporation did not open negotiations or alter the provisions of the existing contract after the issuance of Executive Order 9240, as amended. The court refused defendants' requested finding that plaintiff's employment was on a weekly basis of $45 per week of variable or fluctuated hours with one-sixth of his weekly wages added for work on Sunday.

At the request of the defendants, the court gave Conclusions of Law that plaintiff was not during any week while employed by defendants engaged in commerce or the production of goods in commerce, and that there is no authority in law for the plaintiff to maintain an action for double time compensation under the terms of Executive Order 9240, as amended, and no cause of action exists in favor of plaintiff against the defendants by reason of or based upon said Executive Order, and that said Order is not binding upon defendants. The court refused defendants' request for Conclusions of Law that during plaintiff's employment defendants were performing a service or constituted a service establishment, and plaintiff was engaged therein, the greater part of which servicing was in intrastate commerce under Section 13(a) (2) of the Fair Labor Standards Act and, by reason thereof, Sections 5 and 7 of said act did not apply to the plaintiff, and that plaintiff was exempt thereunder. The court refused also Conclusion of Law that plaintiff's regular rate of pay is determined in each week by dividing the total weekly wage for the workweek by the number of hours worked in each week.

The judgment entry was, in substance, that the court found the plaintiff was not, during any week of his employment, engaged in commerce or in the production of goods for commerce, and was not entitled to overtime compensation under the Fair Labor Standards Act of 1938; that plaintiff has no litigable right to sue for double time compensation for work on the seventh consecutive day under Executive Order 9240, as amended by Executive Order 9248; and that no cause of action exists in plaintiff's favor against defendants under said Executive Order; that said Order is not binding upon defendants. It was, therefore, adjudged and decreed that plaintiff take nothing under Count 1 of his petition, and that defendants be discharged and have judgment against plaintiff on said count, and for costs incurred with execution therefor; and that plaintiff take nothing under Count 2 of this petition, and that defendants be discharged and have judgment against plaintiff under said count, and for costs and with execution.

Appellant's points are:

I

Plaintiff was engaged interstate commerce and his services were so related to the transportation and movement of goods in commerce and were so essential thereto as to become a part thereof within the meaning of the Fair Labor Standards Act of 1938.

## II

Plaintiff was engaged in a process and occupation necessary to the subsequent production of goods for commerce and his services substantially affected such production, and plaintiff was, therefore, engaged in the production of goods for commerce within the meaning of the Fair Labor Standards Act of 1938.

## III

Plaintiff is entitled to recover, as third party beneficiary, under the contract between defendants and the Defense Plant Corporation, for services performed on the seventh consecutive day of any workweek subsequent to October 1, 1942, the effective day of any Executive Order 9240, it having been conceded by defendants that plaintiff's services were related to the prosecution of the war.

## IV

The judgment of the trial court should be reversed and the case remanded with directions to the trial court to enter judgment for plaintiff.

Appellant bases his first count upon the Fair Labor Standards Act of 1938 (52 Stat. 1060, 29 U. S. C. A. Tit. 29, Sec. 201, et seq.). This act provides, among other things, for minimum wages (Sec. 6), and minimum hours (Sec. 7), for employees who are engaged in commerce, or in the production of goods for commerce. Section 7 limits the workweek to 40 hours after the expiration of the second year of the date of the act, unless such employee receives compensation for his employment in excess thereof at not less than one and one-half times the regular rate at which he is employed. Section 13(e) (U. S. C. A. Tit. 29, Sec. 213 (a) ) exempts certain employees among whom is (2) "any employee engaged in any retail or service establishment, the greater part of whose selling or servicing is in intrastate commerce". The other exemptions specified are not herein involved. Among the penalties provided for violation of Sections 6 and 7 of the act, is that the employer shall be liable to the employee in the amount of his unpaid minimum wage, or unpaid overtime compensation, as the case may be, and an additional equal amount as liquidated damages. In an action brought by the employee for such penalties, the court may allow the plaintiff a reasonable attorney's fee to be paid by the defendant, and costs of the action.

Section 3 of the Act (U. S. C. A., Tit. 29, Sec. 203) defines the word "commerce" to mean "trade, commerce, transportation, transmission, or communication among several States or from any State to any place outside thereof". The word "employee" is defined as "any individual employed by an employer". "Goods" is defined as "wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does

not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer or processer thereof". "Produced" is defined as "produced, manufactured, mined, handled, or in any other manner worked on in any state; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State".

Appellant's first contention under his Count 1 is that the court erred in finding that appellant was not engaged in interstate commerce, and that his services were not so related to the transportation and movement of goods in commerce and not so essential thereto as to become a part thereof within the meaning of the Fair Labor Standards Act of 1938.

It must be borne in mind that it was not the intent of Congress to extend the definition of "commerce", for the purpose of the Fair Labor Standards Act, to activities merely "affecting commerce", as provided in certain other regulations. Kirschbaum v. Walling, 316 U. S. 517, 62 S. Ct. 1116. To determine whether the Act applies in a case such as this, the deciding factor is the activities of the employee and not the character of the employer's business. [Overstreet v. North Shore Corporation, 318 U. S. 125, 63 S. Ct. 494, 87 L. Ed. 656. Kirschbaum v. Walling, *supra*.] The Act, by its terms, is made to apply to an employee who is engaged in commerce as therein defined, or who is engaged in the production of goods for such "commerce", as the word "produce" is therein defined.

It is admitted in this case that plaintiff did not load or unload any materials received by the defendants in the concrete construction forming a part of the plant in question. There is no evidence that any of the sand, rock and cement received by the defendants for the concrete work was again placed in transit, or sold, but the evidence is that the same was used on the site and was mixed, distributed and installed as a part of the plant construction. At no time during plaintiff's employment was the plant used for manufacture or production of any product whatever. It is also undisputed that the entire project under defendants' contract was for an original construction.

The defendants maintained a Purchasing Department, with Traffic and Expediting Departments, a Warehouse Superintendent, and an Auditing Department. Plaintiff was not employed in any of these departments, which, upon requisition by plaintiff's superintendent, respectively obtained competitive bids, selected the vendors, purchased the materials, expedited delivery, provided storage and audited the accounts. Other employees loaded and unloaded the materials. For

the information of the superintendent in the concrete department the plaintiff, among other duties, posted supply data from railroad manifests and truck delivery tickets, showing the amounts of deliveries and the distribution thereof to the various concrete batch locations on the site from reports made to him by the various foremen. He also supplied cost reports and truck hire records from information brought him by other employees. All this information, gathered from original records already made by other departments and employees, was used by the concrete superintendent, among other things, to keep posted on the supply of sand, rock and cement on hand. All materials entering the plant site were checked by guards and others stationed at the various entrances. Appellant's place of employment was in a small, temporary office structure at the concrete batch plant near the center of the plant site. Prior to January 13, 1943, concrete was purchased locally in ready mixed form from a subcontractor, and deliveries of same were checked by the warehouse employees and reports made therefor to the concrete department. The truckloads thereof were checked at the gates by the same department. After January 13, 1943, defendants made their own concrete on the plant site and the ordering, delivering, maintaining and distributing of the rock, sand and cement therefor were handled by the various departments heretofore noted so far as records thereof are concerned.

Assuming that a substantial part of appellant's duties consisted of posting the information furnished him by the other departments, and other employees pertaining to materials arrived and on order, and that he relayed this information to his superintendent (along with other, clerical services performed), for use in determining the supplies on hand and needed, we are of the opinion that plaintiff was not engaged in interstate commerce in the sense contemplated by the Fair Labor Standards Act. The fact that such reports of material contained car and order numbers is not sufficient to characterize plaintiff's duties as interstate commerce nor is the fact that such information helped his superintendent to determine the need for supplies.

Appellant further argues that the services he performed were so closely related to the movement of commerce as to be, for all practical purposes, an essential part thereof. The "closeness" of the employee's services as related to the actual movement of commerce in the sense referred to, "depends upon the essentiality and indispensability of the particular work or service performed to the actual movement of commerce". [Walling v. Consumers Company, 149 Fed. 626, 629; Overstreet v. North Shore Company, *supra*.] Unloading of an interstate shipment has been held to be an integral or component part of the interstate-journey. [Baltimore & Ohio S. W. R. Co. v. Burtch, 263 U. S. 540, 44 S. Ct. 165, 68 L. Ed. 433; Fleming v. Jacksonville Paper Co., 128 Fed. (2d) 395.] Work being done by an employee upon

or in connection with an instrumentality which itself is *being used* in interstate commerce, such as tracks, bridges, locomotives or cars embarked or immediately about to embark upon such commerce, or undergoing repairs has been held to be in interstate commerce. Hallstein v. Pa. R. Co., 30 Fed. (2d) 594, 595, and authorities therein cited. The work of a warehouse clerk and foreman employed on an Alaskan highway project where their activities had to do with goods transported from the United States to the warehouse near the highway project and later transported to the contractors was held to be in interstate commerce. (Crabb v. Weldon Bros. 65 F. Supp. 369.) The duties of one of the plaintiffs there were to superintend the warehouse where the property was temporarily stored, checking the material in and out, having custody of all warehouse receipts, and invoicing all property in transit in the warehouse. He also assisted in unloading some of the goods into the transportation trucks. Another plaintiff in that case was foreman of the building of the permanent bridges on the highway, hiring and discharging workmen thereon, and the court held that the bridges were in use for the transportation of interstate shipments of material, and that such foreman was engaged in interstate commerce. The court held, however, that the construction of the highway was not "producing goods" in the sense of the act.

In Walling v. Goldblatt Bros., 128 Fed. (2d) 778, the employer operated three warehouses in Chicago owned by him, where merchandise was received from other states and thereafter distributed to different stores in Illinois and Indiana. In ruling upon the applicability of the Fair Labor Standards Act to the various classifications of employees therein involved, the court held, among other things, that that group of employees who ordered and procured, and those who unloaded goods from without the state, at defendant's warehouse, those who checked them before their deposit on the unloading platform, those who manufactured goods at the warehouses and engaged in maintaining, operating and caring for the warehouses where production of clothing occurred, and those who packed and shipped the goods to Indiana, were within the Act. The court said: "Those employees, however, who are concerned solely with storage in the warehouses and in delivery of goods to the Illinois stores, those printing and preparing records, books, memoranda and advertising copy are not subject to the Act."

It was said in Noonan v. Fruco Const. Co., 140 Fed. (2d) 633, by the United States Circuit Court of Appeals for the Eighth Circuit:

"In the instant case appellants were employed as watchmen or guards to protect the premises upon which the plant was being erected and to safeguard the materials going into its construction. It may be that their activities promoted and facilitated the erection of the plant and were, therefore, so closely connected with and directly re-

lated to the 'production' of the plant as to be 'necessary' thereto. But the plant itself was not a commodity which could be the subject of interstate commerce. It was permanently placed upon an immovable site of land and was not a thing transportable in commerce, nor a device or object upon which other articles could be shipped to other states. Clearly the activities which went into its construction were local."

We are convinced that under the evidence the plaintiff's duties were not so essential or indispensable to the shipments of rock, sand and cement to the defendants from other states as to make such duties so closely related to such interstate shipments as to constitute plaintiff's services as a part of interstate commerce. The requisitioning, obtaining bids for, contracting for, ordering, expediting, receiving, checking, storage, and distribution of all such materials reaching plaintiff's department were handled entirely by others and the information respecting the same posted from time to time by the plaintiff on books and records kept by him was furnished by other employees having directly to do with such matters. The mere fact that some of appellant's clerical entries were of use to the superintendent of the concrete department in determining the condition of supplies and the progress and cost of the work would not be sufficient to characterize plaintiff's duties as interstate commerce or so closely related thereto as to be a part thereof.

Appellant further contends that he was engaged in the "production" of goods for commerce as provided in Sections 6 and 7 of the Fair Labor Standards Act. He claims to come within the definintion of "produced" in Section 3(j) of the Act in that he claims to have handled or worked on goods which were subjects of interstate commerce, or in an "occupation necessary to the production thereof". As stated, there was no evidence that any manufacturing was done at the plant by Pratt & Whitney, subcontractors to the United Aircraft Corporation, agent for the Defense Plant Corporation, or by anyone else during the period of plaintiff's employment. In fact the evidence is that the project was completed a long time after his employment ceased. But appellant insists that that fact is immaterial if the plaintiff's duties were a necessary precedent to the production of goods in the plant. Appellant emphasizes the case of Warren-Bradshaw Drilling Co., v. Hall, 317 U. S. 88, 63 S. Ct. 125. In that case employees were engaged in drilling oil wells to a depth just short of shooting and before oil was produced. The majority opinion held that the piercing of the earth and the partial drilling of the well were essential to its completion and the capturing of the oil, and made the plaintiff's activities a close and immediate tie to production. This case could not apply here where, had plaintiff's services been wholly dispensed with, the records of shipments referred to in his reports would no doubt have been fully available from original sources.

In Kirschbaum v. Walling, 316 U. S. 517, 62 S. Ct. 1116, the employees were engaged in the operation and maintenance of a loft building concededly used mainly by tenants engaged in manufacturing large quantities of goods for interstate commerce, and the employer owned the building and operated the same for such tenants. The employees involved were firemen, electricians, elevators operators, watchmen, porters, carpenters and carpenters' helpers, performing customary duties of persons charged with the maintenance of such a building. The engineer and firemen produced heat, hot water and steam necessary to the manufacturing operations. They also kept the elevators, radiators and fire sprinkler systems in repair. The electrician maintained a system which furnished light and power to the tenants; the elevator operators ran the freight elevators which began and completed interstate shipments to and from the tenants, and carried passengers, salesmen and visitors to such tenants. The watchmen protected the building from fire and theft; the carpenters kept the halls and staircases in repair; the porters kept the building clean. The court held that without the light, heat and power the tenants could not engage in the production of the goods for interstate commerce; that the maintenance of a safe, habitable building was indispensable to the interstate business of the tenants, and that the said employees were engaged in occupations necessary to the production of goods for commerce within the meaning of the words of the Act defining "production", and in view of the relation such services bore to the conceded production of goods for commerce by the tenants. The court pointed out that it was not necessary for the employer himself to be engaged in an entenprise partaking in interstate commerce, and that the character of the employees' activities was the test. We deem this case inapplicable here because nothing was produced through the activities of the appellant which was a subject of interstate commerce.

We hold that under the evidence the plaintiff was not engaged in a process or occupation necessary to the production of goods for interstate commerce within the meaning of the Fair Labor Standards Act.

Respondents, moreover, maintain that the Act does not apply to plaintiff in any respect, because under the evidence the entire project on which appellant worked was an original construction. They argue that it makes no difference what the building was intended to be used for when completed if it was not so used during the period of plaintiff's employment, and for that reason the plaintiff was not engaged in commerce unless he is himself actually engaged therein or unless his services were so closely related to the movement of goods in interstate commerce as to be a part of the same. They make a distinction between the original construction on the one hand, and work in connection with the alteration, repair and maintenance of a building al-

ready in use for the production of goods in interstate commerce on the other. They point out that plaintiff left his employment May 1, 1943, and that the building was not completed or used until January 31, 1944.

In Brue, et al., v. J. Rich Steers, Inc., 60 F. Supp. 668, (U. S. Dist. Ct. So. Dist. of N. Y.), overtime wages were sought under the Fair Labor Standards Act for services to defendants who constructed dry docks in the Brooklyn Navy Yard. Part of the duties of the plaintiff was to see that the proper grade of concrete was sent down under water into the under-water forms; that they were evenly filled and that the concrete was properly poured. The plaintiff contended, among other things, that since it was his duty to see that a proper grade of concrete was supplied to the under-water forms, and that the forms were evenly filled, and that the concrete was properly poured to construct the dry dock to be used in the building of vessels for interstate commerce, that he was engaged in the production of goods for interstate commerce. The court said this argument would be sound if the dry dock had been completed and in use, as described, but could not apply to the original construction before its erection and use. The court said:

"One employed as an inspector of concrete work in the original construction of a new building is not himself engaged in interstate commerce or in the production of goods which passed into interstate commerce, nor do his services directly relate to interstate commerce, although the building, when finished, is intended for use for the production of goods for interstate commerce."

The respondents here argue that the future use of the completed plant was not a certain fact as it depended upon the length of the war, the progress of the war, the change in war-making instrumentalities, and upon the plans of the War and Navy Departments; in other words, it might have been eventually used, when completed, for purely intrastate production. [Muldowney v. Seaburg Elevator Co., 39 Fed. Supp. 275; Dollar v. Caddo River Lumber Co., 43 F. Supp. 822; Barbe v. Cummins Const. Co., 49 F. Supp. 168.]

In applying the Federal Employer's Liability Act, the courts have distinguished cases wherein the employee depended for its application upon services on an instrumentality merely intended for use in interstate commerce. In Bavis v. Chicago, M. & St. P. Ry. Co., 217 Fed. 234, the Circuit Court of Appeals of the Eighth Circuit found that no interstate feature existed in the plaintiff's case where he worked on the construction of a railroad bridge for a cut-off, and where there were no rails on the roadbed, and the cut-off was not in use and never had been used and could not be until tracks were laid. The court said: "The mere fact that is was the purpose and intention so to use it at some future time did not make it an instru-

mentality of interstate commerce. That purpose and intention might be changed and it might never be used in interstate commerce or at all.

. . .

"Those employed in the preparation or construction of roadbeds, rails, ties, cars, engines and other instrumentalities which are intended for use in interstate commerce, but have never been and are not in use therein, are not employed in interstate commerce, and are not protected by that act".

In Hallstein v. Pa. R. Co., 30 Fed. (2d) 594, it was said:

"Where the instrumentality upon which the employee is at work or in connection with which he is engaged is not directly connected with the interstate transportation, or where such instrumentality has been withdrawn from or not yet dedicated to use in such commerce, although it may last have been so used or be intended ultimately for such use, it has repeatedly been held that the work was not so closely related to interstate commerce as to be practically a part of it."

See, also, N. Y. Central R. Co. v. White, 243 U. S. 188, 37 S. Ct. 247; Raymond v. Chicago, Milwaukee & St. Paul Ry. Co., 243 U. S. 43, 37 S. Ct. 268. These authorities are persuasive in considering the similar feature of the Fair Labor Standards Act here in question.

In the recent case of Walling v. McGrady, 156 Fed. (2d) 932, various employees sought recovery under the Fair Labor Standards Act. Some worked on roads, others on bridges terminal facilities, railroad facilities, industrial plant facilities, loading ore and stone. The court ruled that they were covered by the Act. But the court found that the railroad and bridge projects were already *in use* for interstate commerce; that the industrial plants were new units for "*existing plants*", and their purpose was *to continue* the operation of the plants "all of which are producing goods for interstate commerce".

Our conclusion is that where the work done by the employee, such as here, is on a project wholly new, not yet used in any manner in interstate commerce, or for the production of goods for such commerce, and not a part of any existing business engaged in interstate commerce, the services of such employee is not covered by the Fair Labor Standards Act unless his particular services are otherwise shown to partake of the character of interstate commerce or so related thereto as to be a part thereof, or that he was thereby himself engaged in the production of goods for commerce within the meaning of the Act, all of which showing is lacking in the evidence before us. Collins v. Ford, Bacon & Davis, 66 F. Supp. 424. It follows that the trial court did not err in its findings of fact and conclusions of law to the effect that appellant was not engaged in interstate commerce nor in the production of goods for commerce.

In his Count 2, the plaintiff seeks to recover benefits by direct action on Executive Order 9240, as amended by Order 9248. Defendants' contract with the Defense Plant Corporation for the construction of the project was dated July 6, 1942. The contract called for schedules of labor and wage payments as determined by the Secretary of Labor which were agreed to and approved in July or August, 1942. The Order, as amended, was dated September 7, 1942, and became effective October 1, 1942. Defendants' contract with the Defense Plant Corporation provided, among other things, that the latter would pay the costs of labor and materials, including salaries of field employees with exceptions not here involved, and "in the execution of this contract Contractor agrees to comply with, and give all stipulations and representations required by, applicable federal laws . . . ". The defendants' general contract made no mention of the Executive Order 9240, as amended, as, in fact, that order was not yet in existence, nor was the contract ever amended or modified to conform to said Executive Order. Such Order, when issued, was, of course, a part of the law of the land. There is no dispute in this case that the Pratt & Whitney plant was a "work in the prosecution of the war".

The purposes of Executive Order 9240, as amended, was, among other things, to promote round-the-clock production, and to correct the evils of absenteeism of employees in war work whereby workweeks were completed on the seventh day thereof or on Saturday and Sunday for which time and a half was demanded. Interpretative Bulletin No. 1, by Secretary of Labor, February 18, 1943. The Order provided, in substance, that "on all work relating to the prosecution of the war" no extra compensation should be paid any such employee for work on Sunday or Saturday except where such work day on such day was on the sixth or seventh day in his regularly scheduled workweek; that where an emergency required an employee to work for seven consecutive days in a regularly scheduled workweek, double time should be paid for work on the seventh day; that where required by law or contract, not more than time and a half should be paid for working in excess of eight hours in any day or 40 hours in any workweek, or for work performed on the sixth day of any scheduled workweek. Time and a half was allowed on certain named national holidays and on one of local importance. Section 2 of the Order provided:

"All Federal departments and agencies shall conform the provisions in all existing and future contracts negotiated, executed, or supervised by them to the policies of this order. All such departments and agencies shall immediately open negotiations to alter provisions in existing contracts to conform them to the requirements of this order".

Section 5 requires such Federal departments and agencies affected by the Order to refer to the Secretary of Labor matters of interpre-

tation and application of the Order, and further provides that the Secretary of Labor may determine that the provisions of the Act shall not apply to any industry or occupation, or to classes of employees therein where he finds that a wage stabilization agreement, approved by the Government, is operating satisfactorily, or where the nature and exigencies of the operations made such determination advisable for the successful prosecution of the war.

The evidence in this case is that although the matter of additional overtime was discussed by plaintiff and representatives of the defendants at different times, the contract of defendants with the Defense Plant Corporation was never modified to conform to the Executive Order, nor was any change made in plaintiff's wage schedule. Plaintiff testified that he understood that the office was trying to figure out a plan to pay him and others similarly employed on an hourly basis, and that he would be paid time and a half for all over 40 hours, and double time on Sundays, and that same would be retroactive from October 1st. He further stated that he understood "the plan was not in effect". The trial court held that the plaintiff has no litigable right to sue the defendants for double time compensation for work on the seventh consecutive days under said Order, and that no cause of action exists in his favor by reason thereof and, further, that said Order was not binding on the defendants.

The evidence fails to show that there was any determination by the Secretary of Labor whether the new rates under the Order should apply to the defendants' contract with the Defense Plant Corporation, or to any of defendants' employees thereunder, and, in fact, it is admitted that defendants' contract was not thereafter altered or modified to change the wage schedules already approved thereunder. For plaintiff, as an employee under the contractor, to have a cause of action for benefits under the Executive Order, directly against the contractor, under such circumstances, it must be assumed that the Secretary of Labor would not have exempted the work on the project in question, or employees therein from the provisions of the Order, and that, had negotiations for conformation been carried to completion, no change would have been made in the contract, affecting wage schedules other than those pertaining merely to overtime and seventh day work. What effect the modification may otherwise have had on the labor element of the project, or what other "exigencies" the Secretary might consider in applying the Order, if he did, cannot be assumed and could not be litigated by a suit by an employee for the increased rates before the Government itself, which was paying the costs, had taken steps to alter the contract. [Perkins v. Lukens Steel Co., 310 U. S. 113, 60 S. Ct. 869, 877.]

This is not a mere question of the right of a third person to bring an action on a contract made for his benefit. It is a question of

whether or not, applying the law he relies upon, a cause of action had accrued to plaintiff under the facts. Certainly defendants would not have had the right to increase the approved wage schedules under the contract and demand reimbursement or credit therefor from the Defense Plant Corporation unless and until the contract with that corporation had been altered by the proper authorities to cover and authorize such additional wage payments as required by the Order.

Appellant relies much on the case of Crabb v. Welden Bros. et al., 65 F. Supp. 369, in which an employee was allowed to recover under Executive Order 9240, but in that case the contract between the employer and the Government *was modified* to include a special provision that ''the hours of employment and wage rates shall also be subject to the provisions of Executive Order No. 9240''.

If individual employees may bring actions under Order 9240 against contractors on war projects, as appellant here contends, without awaiting the consummation of negotiations between the Government and the contractor to conform existing contracts, as provided, much of the discretion reposed in the Secretary of Labor respecting application of the Act would be destroyed; the stability of wage schedules on war projects would be shattered; confusion in such projects would ensue and progress of the prosecution of the war greatly hampered by litigation. We do not believe such was the intent or contemplation of the Order.

Hence we conclude that the court did not err in its ruling on plaintiff's Count 2.

Finding no substantial error in the trial of this cause, the judgment is affirmed. All concur.