AUBUCHON et al. v. FRAZIER et al. Defendants (Reconstruction Finance Corp., Third Party Defendants).

No. 5413.

United States District Court
E. D. Missouri, E. D.

July 12, 1951.

Strubinger, Tudor, Tombrink & Wion, and Dennis E. Woodside, all of St. Louis, Mo., for plaintiffs.

Fordyce, Mayne, Hartman, Renard & Stribling, and Thomas Rowe Schwarz, all of St. Louis, Mo., for defendants.

Sidney B. McClanahan, of St. Louis, Mo., for third party defendant.

HULEN, District Judge.

Forty-seven plaintiffs, performing guard duties on an original construction project for defendant corporation, sue for overtime compensation under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. The matter of hours worked by the plaintiffs is not in issue. The questions presented: (1) Are guards of an original construction engaged in interstate commerce if a major portion of the materials used in the construction flows in interstate commerce and there are other interstate features of the operation? (As part of the building was completed it was taken over by a Lessee and used for production which was delivered in interstate commerce. Although the Lessee has its own guard force there is some overlapping and secondary benefit to the Lessee through defendants' guards.) (2) If plaintiffs meet the interstate commerce test, are defendants relieved of liability under the Portal-to-Portal Act, 29 U.S.C.A. § 251 et seq.? (Because failure to pay overtime was the result of reliance by defendants on an interpretative bulletin issued by the Secretary of Labor, through the Wage and Hour Administration, that employees engaged in original construction are not generally within the scope of the "Act".)

Defendants, on November 27, 1941, contracted with Defense Plant Corporation,[1] on a cost-plus-fixed-fee basis, for construction of a building at Granite City, Illinois,

---

1. Referred to herein as "Agency".

to house a foundry and machine shop. The building was constructed on a vacant tract of over one hundred acres. The Agency was a wholly-owned Government subsidiary. Work started on the project early in 1942. At the outset the project was enclosed with a fence. Although the contract did not specifically require defendants to guard the premises, soon after the work started the Agency served notice on defendants, through its supervising engineer, William S. Flohr, that the project must be guarded. The guards were procured through F. W. Bender, to insure investigation of those applying for the work. On January 12, 1942, Bender made his recommendations for the various guard posts, and organization of the guard service with lieutenants and a captain in charge. The "original purchase order" for guards (defendants' Exhibit No. 16), dated January 2, 1942, was on a forty-hour week basis. On March 12, 1942, the original purchase order was changed to a forty-eight hour week basis. This change resulted when Flohr advised defendants that payment to guards for overtime was not justified because guards were not within the coverage of the Fair Labor Standards Act.

Construction started in January, 1942. Guard service, originally confined to gates and grounds, was broadened, as the building progressed, to cover both the inside and outside of the buildings. The number of guards varied. Some posts required guards for three eight-hour periods, some for two eight-hour periods, and some for one eight-hour period. All guards rotated on the various posts with the exception of two. Whether the guards rotated shifts does not appear. As of November 24, 1942, there were seventeen posts. An example of location of posts and whether on one or more shifts is shown by defendants' Exhibit 5.[2]

A major portion of materials that went into the building was received at Granite City through interstate transportation. Switch tracks of the St. Louis Terminal Railroad passed through a gate of the fenced enclosure. The gate was kept locked except when material was being delivered by train. Some building materials arrived by truck, as well as rail. As a rule all materials were checked at entrance gate, by a receiving clerk, that they might be dispatched to proper siding or location to make it convenient in the building operation. The train switch foreman had a key to the rail gate; also the guard on that post had a key available. The cars and trucks were inspected at the gate by guards for discovery of unauthorized persons. Defendants' administrative building had a telephone switchboard over which long distance calls were made. This building housed the records of defendants. In the inside of the building was a guard post.

2.   *   *   *   *   *   *   *   *   *   *   *   *   *

"The guards on this project at present are placed in the following positions and patrols:

| | 7–3 | 3–11 | 11–7 |
|---|---|---|---|
| "General Steel Bldg. | 2 | 1 | 1 |
| Frazier Davis Bldg. | 2 | 1 | 1 |
| Front Gate | 1 | 1 | 1 |
| Checkers Gate | 1 | 1 | 1 |
| Personnel Office | 1 | 1 part time | 0 |
| Open Hearth patrol | 1 | 1 | 1 |
| Bldg. 7–8–9 patrol | 1 | 1 | 1 |
| Bldg. 10 & adjacent bldg. | 1 | 0 | 0 |
| Bldg. 20–21 patrol | 1 | 1 | 1 |
| Reservoir patrol East | 1 | 0 | 0 |
| North Gate and patrol | 1 | 1 | 1 |
| Compressor Bldg. | 0 E.patrol | 1 | 1 |
| Relief Guard | 1 | P.T.per. | 0 |
| Southwest patrol | 0 | 1 | 0 |
| Scale House patrol | 0 | 1 | 0 |
| East End patrol | 0 | 0 | 0 |
| Outside of Open hearth | 0 | 0 | 1 " |

The building was erected for lease to the General Steel Castings Corporation.[3] The Lessee had a building in the immediate vicinity in which a cafeteria was operating. The defendants' employees used the cafeteria. Employees of other industries in the neighborhood also used the cafeteria. It was semi-public. Defendants had a guard posted at the cafeteria to maintain order after their employees started to use it. Power wires, with part at least of the power passing interstate, with transformers, were on the premises. Defendants used power from this source in their building operations.

Early in 1943 the main building had progressed to a point where the Lessee called for possession of a part to commence production. Delivery of a part of the building was then made by defendants to the Lessee. As the building progressed, additional parts were delivered in like manner to the Lessee. The Lessee produced castings which thereafter moved in interstate commerce. Upon space being turned over to the Lessee, that part of the building was partitioned off with open wire netting fence from the part of the building still under construction. (See blueprint, defendants' Exhibit No. 12.) The Lessee was required to, and did, furnish guards for that portion of the building in use by it, and defendants were relieved of responsibility for guard service on delivered portions of the building. Instructions on division of guard responsibility were specific. Flohr advised defendant, in part, as follows, on February 13, 1943:

"On February 15th, 1943 certain areas in the Plant and grounds are to be turned over to the General Steel Castings Corporation for operation. Progressively thereafter additional areas will be added to the operating areas.

"As various areas in the Plant are turned over to the General Steel Castings Corporation they will become known as "Restricted Areas" and will be so marked. Admission to these areas will be subject to the regulations of the Sixth Service Command, United States Army.

"Construction workers will not be allowed in these restricted areas except on passes to be issued by General Steel Castings Corporation.

"Violation of this provision of the Sixth Service Command, United States Army regulations will be deemed sufficient cause for dismissal of construction employees."

As a result of the Flohr communication defendants issued an order on the same day to all its foremen from which the following excerpts are taken:

"To all Foremen and Sub-Contractors:—

"In accordance with instructions received from the Defense Plant Corporation as various areas of the Plant are completed and turned over to the General Steel Castings Corporation, there will be established 'Restricted Areas' which will not be entered by employees of Frazier-Davis Construction Company or their Sub-Contractors, except under the conditions stated below. These 'Restricted Areas' will be plainly marked with signs reading:

'Restricted Area'
'Keep Out'

"After the establishment of these 'Restricted Areas' and the placing of signs, the Guard Force will be charged with the duty of keeping all unauthorized persons from entering said 'Restricted Areas'.

\* \* \* \* \* \*

"As it becomes necessary for the employees of Frazier-Davis Construction Company or their sub-contractors to return to these 'Restricted Areas' to perform additional work, they will be admitted under the following conditions:

"A. Frazier-Davis Construction Company and the General Steel Castings Corporation will make the necessary arrangements as to the time and place and the extent of work to be done.

"B. The Frazier-Davis Construction Company will submit a list of the necessary personnel to the Works Manager of the General Steel Castings Corporation, who will authorize the admission of the construction workers who are required in a

3. Herein referred to as "Lessee".

'Restricted Area' for such time as is necessary to complete the particular job."

The foregoing instructions from Flohr, and defendants to their foreman, resulted from a telegram dated February 11 (defendants' Exhibit No. 13) from W. L. Drager, Chief Engineer, to Flohr:

"Re * * *

"General Steel Castings. DPC and lessee's policing cannot overlap. Lessee will have to assume full responsibility for policing area in which it will be working. DPC will continue to police area in which construction is underway. Lessee will also accept full responsibility for damage caused by operations regardless of where it occurs in the plant.

"W. L. Drager

Chief Engineer. Feb 12 820A"

The terms of these directives were carefully carried out by the defendants. Defendants' Exhibit 9, an order from defendants' superintendent on the job, is illustrative of the procedure of defendants following the orders from Flohr. After the Lessee took over a part of the building, a section of the wires conveying power to the Lessee passed over grounds patrolled by defendants' guards. The power transformers were then guarded by Lessee's guards. Portions of the grounds adjacent to parts of the building taken over by Lessee were fenced off and patrolled by Lessee's guards, but a saboteur intent on reaching Lessee's operation might have passed a fence or gate guarded by defendants' guards or over ground policed by defendants' guards. Defendants' guards stationed inside the building under construction could look through the wire netting and see the Lessee's operations. All employees passed through the main gate. It was guarded by defendants. The guard at this gate was mainly engaged in regulating traffic. After the employees passed through the main gate they were divided and defendants' employees were required to go through one gate and Lessee's employees another, where a security check was made. The security check at the gate where the Lessee's employees entered was made by the Lessee's guards. Trucks followed the same procedure.

A memorandum was introduced by plaintiffs setting forth the guard duties. (Plaintiffs' Exhibit D) Defendants' superintendent disputed the distribution of this general instruction to its guards and maintained that it was delivered to the guards of the Lessee. There was an instruction sheet delivered to the guards of defendants but it was not offered in evidence. With the exception of two posts, there does not appear to have been any special duties assigned to the guards other than what would be expected under the circumstances prevailing during war, such as protecting property, maintenance of order, checking personnel, etc. It is presumed that if one of defendants' guards observed anything calling for guard attention on the Lessee's property, he would not have ignored it but would have taken the steps necessary to meet the situation. There is no evidence of any such incident. The execution of guard duties, defendants as to construction and Lessee as to production, was carried out in accord with directives as to separation of responsibility without notiable variation.

The period of employment of the various plaintiffs varied. It covered the period from February 1942 to October 1943. This suit was filed May 19, 1947. If findings on the main issue are in favor of plaintiffs, the parties are agreed on amount of overtime compensation.

## I.

■ . The burden is on plaintiffs to prove engagement in production of goods for interstate commerce within the Fair Labor Standards Act, during a whole or part of the period sued for. "The lack of precise statutory boundaries for a determination of coverage under the Act makes its application dependent upon facts peculiar or indigenous to the particular business or industry involved and necessitates an examination of the relationship of the employee to the production to which he claims his activities are 'necessary'." See Noonan v. Fruco Const. Co., 8 Cir., 1943, 140 F.2d 633, 634.

■ That plaintiffs were guards engaged in protecting a building in course of construction, the building being erected

from materials delivered in substantial portions through interstate commerce, and to be used as completed by a third party for production to travel through interstate commerce, and to be used when fully completed for manufacturing products that would move in interstate commerce, does not bring plaintiffs under the Act. The Noonan case so holds. This Court is bound by the ruling of this Circuit in that case.

Do additional features of interstate commerce, present in this record, bring plaintiffs within the Act? We question the presence of such a premise for consideration of the case. Of the forty-seven plaintiffs (including those who have filed consent), only six appeared as witnesses. As to the remainder it was stipulated that they performed general guard duties of a nature similar to the duties performed by those who did testify. Defendants' Exhibit 5 evidences that as of November 24, 1942 guards were employed in three shifts, assigned to eight posts; there were two shifts on one post, one shift on five posts, and two posts with part time second shift. The guards on two posts did not change; on the other post they rotated. The record does not show if the guards rotated shifts as well as posts. Trains entered through a guarded gate opened by a guard only during one shift. Some administrative building guards were present on only one shift. The record does not show which plaintiff or plaintiffs— (1) guarded the switchboard, (2) guarded the power lines, (3) opened gates to permit trains to enter, (4) inspected freight cars, (5) guarded inside buildings and were able to look into the Lessee's portion of the building, (6) guarded the main gate, (7) guarded the cafeteria, (8) inspected trucks, and other incidental duties connected with production for interstate commerce. To find that any guard, any plaintiff, during any week, engaged in any one or all of the eight assignments listed, or to a substantial extent, would be to resort to pure guess and speculation. A verdict cannot find support thereby.

But, arguendo, assume that each guard, each plaintiff, each week for which a claim is made, performed guard duties with respect to all eight situations, to a substantial extent of time. Would plaintiffs' services then be within the Act as being necessary for ultimate production of goods for interstate commerce?

Employment activity which might merely affect production, while of patent value under some laws to establish interstate commerce connection, is insufficient under the Fair Labor Standards Act. The Supreme Court said in Kirschbaum v. Walling, 316 U.S. 517, loc. cit. 525, 62 S.Ct. 1116, loc. cit. 1121, 86 L.Ed. 1638: "If the work of the employees has only the most tenuous relation to, and is not in any fitting sense 'necessary' to, the production, it is immaterial that their activities would be substantially the same if the employees worked directly for the producers of goods for commerce."

Taken singly or as a whole, the activities upon which plaintiffs rely cannot be said in any fitting sense to be necessary to the production of the Lessee for interstate commerce, or that defendants were engaged in interstate commerce, within the meaning of the Act. Defendants and Lessee received instructions, in a detailed manner, to divide guard service, when the Lessee first took over a part of the building. The defendants and Lessee endeavored to and did comply with the instructions. In so far as the circumstances permitted, the guard duties thereafter performed were distinctly in accord with the instructions. To bring this case within the requirement as to interstate commerce the activities of the guards should have some tie with the production for commerce.

The Noonan case holds that the tie must be so "close and immediate" as to be "an essential part" of the production. The record in this case fails to establish a tie, even loose and remote, with production for interstate commerce by the Lessee. The guard duties performed by plaintiffs were a necessity resulting from conditions produced by the war emergency and were maintained to avoid sabotage which may fall in the wake of construction for war. As to Lessee's production, it could proceed, and was intended to, independent of the services performed by the guards of defendants. The secondary benefit, if such

it can be called, derived by the Lessee from defendants' guards—such as some of the plaintiffs being able to look through the wire net partitions separating the Lessee's operation from that part of the building under construction; the presence of a switchboard in defendants' administration building (that may have served the Lessee, although there is no evidence of it) used in making interstate calls by defendants; that anyone desiring to reach the buildings in which Lessee was operating might cross fences guarded by some of the plaintiffs; or the guarding of ground over which power wires crossed between the transformers—we find of no value on this issue. Such services are remote and speculative as being of any value to the Lessee or having any connection with Lessee's operations. In so far as defendants' operation is concerned, the opening of gates for spotting of cars, and the checking of incoming construction materials, both by train and truck, to direct its place of unloading, during a part of one shift on one or two posts, the guard post in the cafeteria used by Lessee's employees, and similar isolated acts were only occasional or incidental contact with interstate commerce.

█ In the case of Hartmaier v. Long, 238 S.W.2d 332, 336, by the Supreme Court of Missouri, will be found substantially the same facts and issues as are raised in this case. Defendants in that case were engaged in a similar construction and the claimants had some incidental connection with interstate commerce. The feature of a part of the construction being taken over, as it was completed, and used, as in this case, is also present. The overlap of services is even greater than in this case as to some of the employees. The Court in that case has gone to great pains to collect the cases and we consider it a full and accurate statement of the law on the questions raised. While the ruling is not binding on this Court, because this is a case based on a Federal statute, yet after a study of the opinion we find it in accord with and in the main based on Federal decisions. On the main question it rules:

"It is well settled that employees engaged in original construction are not with-in the Act even though the building or facility will be used for purposes within the Act upon completion.[9]

"[9] McDaniel v. Brown & Root, Inc., 10 Cir., 172 F.2d 466, 471[1]. See also Cooper v. Rust Eng. Co., D.C.Ky., 84 F.Supp. 149, Id, 6 Cir., 181 F.2d 107, opinion, petition for rehearing, [6 Cir.], 187 F.2d 732, certiorari denied, 340 U.S. 879, 71 S.Ct. 116, 95 L.Ed. 639; Scholl v. McWilliams Dredging Co., 2 Cir., 169 F.2d 729, 731 [3-5]; Noonan v. Fruco Const. Co., 8 Cir., 140 F.2d 633, 634, 635; Parham v. Austin Co., 5 Cir., 158 F.2d 566, 567; Collins v. Ford, Bacon & Davis, Inc., D.C., 66 F.Supp. 424, 425[1]; Damon v. Ford Bacon & Davis, Inc., D.C.E.D.Pa., 62 F.Supp. 446, 448; Adams v. Long, 239 Mo.App. 1227, 202 S.W.2d 112, 123; Annotation, 8 A.L.R.2d 744, 747."

On the effect of releasing a part of the building to the manufacturer (Pratt & Whitney) and the overlapping of services, as well as defendants' employees (plaintiffs) rendering some services to the production of Lessee, the facts are closely analogous to those in this case, but there is a closer relation to commerce than is present in this record:

"* * * As Pratt & Whitney took over released sections of the manufacturing building, Long-Turner employees were excluded and plaintiff-firemen and guards ceased to have jurisdiction over that space. Pratt & Whitney guards worked at the outside gates with Long-Turner guards for a short time, but the Long-Turner guards were soon transferred to cover the inside area for construction work. The cooperation between the fire departments called to our attention was the answering of fire calls in a transformer on a pole and a fire causing $15 damage to lumber in a boxcar. The firemen were those at the two fire stations. Firemen guarding the salamanders were not involved.

"The nurse testified that she treated Pratt & Whitney employees on occasions when they came to her for aid before the Pratt & Whitney infirmary was opened.

"The waterboys, while on their posts for Long-Turner, would supply water to anyone who asked for it, including Pratt &

Whitney employees if they requested a drink.

* * * * * *

"Furthermore, the evidence does not establish that any specific fireman, guard, waterboy, or the nurse engaged in the production of goods for commerce for any substantial period of any given workweek; and it is impossible to say that any plaintiff performed such work within any given workweek and, if so, whether he worked in excess of forty hours that particular week. * * *

"Remote and inconsequential transactions involving commerce do not change the fundamental nature of new construction, the rule of de minimus applying. * * *"

We find and conclude plaintiffs have failed to carry the burden of proof on the issue of interstate commerce, as set out above.

## II.

▓▓ Our holding under point I makes it unnecessary to rule on point II—the defense of the Portal-to-Portal Act. We deem it better practice for this trial court to pass on all issues raised.

The defendants have the burden of proof. The record is undisputed that the defendants relied upon interpretative bulletin No. 5, Section 12, issued by the Secretary of Labor,[4] that the plaintiffs were not within the coverage of the Fair Labor Standards Act. This ruling had been obtained by the building trades organization of which defendants were members. During the progress of the work the Defense Plant Corporation informed the defendants that employees doing guard work such as plaintiffs were doing were not entitled to overtime in view of interpretative bulletin No. 5, and this position of the Defense Plant

Corporation was the occasion for changing the work period from 40 to 48 hours. The law on this phase of the case is plain. See Section 258, U.S.C.A. Title 29.

---

4. "12. The question arises whether the employees of builders and contractors are entitled to the benefits of the act. The employees of local construction contractors generally are not engaged in interstate commerce and do not produce any goods which are shipped or sold across State lines. Thus, it is our opinion that employees engaged in the original construction of buildings are not generally within the scope of the act, even if the buildings when completed will be used to produce goods for commerce. There may be particular employees of such construction contractors, however, who engaged in the interstate transportation of materials or other forms of interstate commerce and are for that reason entitled to the benefits of the Act."